Willard GIPSON, Appellant,

v.

STATE of Alaska, Appellee.

No. 3594.

Supreme Court of Alaska.

April 18, 1980.

Patrick Owen, Carol Johnson, Birch, Horton, Bittner & Monroe, Anchorage, for appellant.

David Mannheimer, Asst. Atty. Gen., Anchorage, Avrum M. Gross, Atty. Gen., Juneau, for appellee.

Before CONNOR, BOOCHEVER, BURKE and MATTHEWS, JJ., and DIMOND, Senior Justice.

## OPINION

BURKE, Justice.

Willard Gipson was tried in the superior court on an indictment charging him with the first degree murder of Vanleftrick Austin Allen, Jr. A jury found Gipson guilty of the lesser included offense of murder in the second degree. He now appeals that conviction and the sentence imposed. We affirm.

Gipson was employed as a clerk at the Airport Lodge in Fairbanks, Alaska. On November 30, 1976, after working from 5:00 a. m. to 2:30 p. m., Gipson began drinking, which he continued to do for the next several hours at various locations in and around the city. Around midnight, after returning to the Lodge, Gipson had several drinks with his wife and retired for the night.

At about 2:00 a. m. Kenneth Alton, another resident of the Lodge, awakened Gipson by banging on his door. Alton, who had locked himself out of his room, requested that Gipson get up and let him into his room with his master key. It was necessary to use Gipson's key because the other master key, which was generally kept in the Lodge office, had not been turned over to the bartender, as it was supposed to be, when the office closed at midnight. After unlocking Alton's door, Gipson proceeded to the bar of the Lodge. There he consumed a quantity of beer and played pool with Robert Oester, another resident of the Lodge. Oester later testified that Gipson was quite upset about being awakened because someone else had not returned the other master key to the bartender.

When the bar closed at 3:00 a. m., Gipson went to the kitchen and cooked breakfast for the people who were still around. Gipson himself continued to drink beer and did not eat breakfast. At about 6:00 a. m. Allen arose and got some coffee from Gipson in the office. Alton testified that Gipson was angry and that he appeared to be "disgusted" with Vanleftrick Austin Allen, another employee of the Lodge. When he asked Gipson about the missing master key, Gipson said Allen had it. Alton and Gipson then went upstairs to the linen room, where Allen usually stayed. There, Gipson confronted Allen about the key, became quite angry, and, according to Alton's testimony, shouted at Allen, "I'll tear your fucking head off. I'm going to beat the shit out of you." Allen replied, "I won't fight with you, Bill." Alton then went downstairs. Gipson, however, went to his room, got his gun, a single-action revolver, and returned to the linen room where he shot Allen.

Gipson testified that he pointed the gun at Allen to frighten him, but that he did not intend to shoot him. He further testified that, while arguing with Allen, he noticed the hammer on the gun was back, and that when he tried to ease the hammer down, the gun discharged, shooting and killing Allen.

Kevin Kelley, another resident of the Lodge, was in the hallway at about 6:30 a. m., when he heard a gun shot. At that

time he saw Gipson come out of the linen room with a gun in his hand and lock the door with a padlock. When Kelley asked what was going on, Gipson told him that it was none of his business. Kelley then returned to his room. Gipson went downstairs to the office and there put the gun in a bag with some beer.

Gipson next went to his room and asked his wife to pack his suitcases, telling her that someone had killed a man with his gun. She told him that if he had not done the shooting, he had nothing to worry about and he should go to work. Gipson then went downstairs, and his wife went back to sleep.

Shortly thereafter, around 7:30 a. m., Gipson awakened Robert Oester by knocking sharply on his door. Oester testified that Gipson appeared "shook-up, . . . kind of excited." Gipson told Oester that he, Gipson, was in trouble because a man down the hall had been shot. Oester testified that Gipson asked, "Would you come and help me get rid of him?" Oester replied "No. You got to be kidding." Gipson responded, "Yes, I guess I am," and left.

After removing the empty shell casing from the gun and reloading it, Gipson walked outside and threw the gun into a nearby snow-covered field. He threw the empty shell casing in another direction. Later in the morning, Gipson told Tae Euy Lee, another employee of the Lodge, that someone had been killed. Lee then called Larry Kim, the owner of the Lodge, who advised Gipson to call the police. Gipson then called the Alaska State Troopers.

When the troopers arrived, Gipson told them a story about hearing a car crash into the Lodge in the middle of the night and later finding Allen's body. He told the troopers he had not seen his gun in about three days, and he "helped" the officers look through the office and his room for the gun. After the troopers had conducted their investigation at the Lodge, they took Gipson to headquarters for further questioning, after which he was placed under arrest. At trial Gipson readily admitted that he had not told the truth to the investigating officers.

**1. *Evidence of specific intent.***

Gipson first contends that the state did not produce evidence sufficient to establish that he acted with the specific intent to kill and that the trial judge, therefore, should have granted his motion for judgment of acquittal or a new trial.

■ Specific intent to kill is an essential element of second degree murder. *Jennings v. State*, 404 P.2d 652, 655 (Alaska 1965). As such, it must be proven by the state beyond a reasonable doubt. *Johnson v. State*, 511 P.2d 118, 125 (Alaska 1973). In considering a motion for a judgment of acquittal, both at trial and on appeal:

[T]he judge must take the view of the evidence and the inferences therefrom most favorable to the state. If the court determines that fair-minded men in the exercise of reasonable judgment could differ on the question of whether guilt has been established beyond a reasonable doubt, then the case must be submitted to the jury.

*Gray v. State*, 463 P.2d 897, 905 (Alaska 1970) (footnote omitted). *See also Des Jardins v. State*, 551 P.2d 181, 184–85 (Alaska 1976). In other words, a motion for judgment of acquittal should be granted only when fair minded persons would *have* to agree that the state had failed to carry its burden of proof beyond a reasonable doubt. Otherwise, the motion should be denied.

■ The jury heard considerable evidence which, if believed, would give rise to a reasonable inference that Gipson intended to kill Allen: Gipson was angry at Allen and threatened him; after shouting angrily at him, Gipson went to his room, got his gun and returned to the linen room where he shot and killed Allen; Gipson then tried to get a friend to help him get rid of Allen's body and made statements indicating that he was considering running away; he apparently tried to get rid of the gun and the spent cartridges, and told conflicting stories about what had happened. Given the above-mentioned standard, we think there

was more than sufficient evidence to support the trial court's denial of Gipson's motion for judgment of acquittal.

The standard of review in examining the trial court's denial of a motion for a new trial is one of abuse of discretion. *Pedersen v. State*, 420 P.2d 327, 333 (Alaska 1966). Given the evidence outlined above, we also conclude that the trial court did not abuse its discretion in denying Gipson's motion for a new trial.

### 2. *Intoxication Instruction.*

There was considerable uncontroverted testimony that Gipson began drinking over twelve hours before Allen was killed and that, except for the brief period of time that he was asleep, he continued drinking steadily until sometime after the shooting. The extent of his intoxication, however, is not clear. Gipson himself testified that he was feeling the effects of the alcohol but, "I think it's probably a matter of opinion whether I was—[as] to how much I was intoxicated." At another point, Gipson testified that he thought he was drunk. Both Tae Euy Lee and Gipson's wife testified that he appeared to be drunk. Three other people who saw Gipson around the time of the shooting, however, testified to the contrary. A state trooper who saw Gipson at the Lodge around 9:00 a. m., some three hours after the shooting, testified that Gipson was drinking beer when he saw him but that he did not appear to be drunk.

One of Gipson's defenses to the charge of murder was that of diminished capacity by reason of intoxication. On appeal Gipson challenges the trial court's instruction on intoxication. Specifically, Gipson objects to jury instruction No. 11:

> Our law provides that "no act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in such condition. But whenever the actual existence of any particular purpose, motive, or intent is a necessary element to constitute any particular species or degree of crime, the jury may take into consideration the fact that the accused was intoxicated at the time in determining the purpose, motive, or intent with which he committed the act."

This means that drunkenness, if the evidence shows that the defendant was in such a condition when allegedly he committed the crime charged, is not of itself a defense in this case. It may throw light on the occurrence and aid you in determining what took place, but when a person in a state of intoxication, voluntarily produced by himself, commits a crime such as that (any of those) charged against the defendant in this case, the law does not permit him to use his own vice as a shelter against the normal legal consequences of his conduct.

Gipson contends that the second paragraph of this instruction was misleading in that it could have led the jury to believe that intoxication was not a significant factor in the determination of whether he was guilty of second degree murder.

We agree with the state that any defect in instruction No. 11 was cured by the court's instruction on the defense of diminished capacity. Jury instruction No. 12 stated:

> If you find from the evidence that at the time the alleged crime was committed, the defendant had substantially reduced mental capacity, whether caused by mental illness, mental defect, intoxication, or any other cause, you must consider what effect if any, this diminished capacity had on the defendant's ability to form any of the specific mental states that are essential elements of murder in the first degree, and murder in the second degree.

> Thus, if you find that the defendant's mental capacity was diminished to the extent that you have a reasonable doubt whether he did, maturely and meaningfully, premeditate, deliberate, and reflect upon the gravity of his contemplated act, or form an intent to kill, you cannot find him guilty of a wilful, deliberate and premeditated murder of the first degree.

> Also, if you find that the defendant's mental capacity was diminished to the

extent that you have a reasonable doubt whether he was able to form the mental states constituting an intention or a design to kill and aforethought, you cannot find him guilty of murder of either the first or second degree.

When read together we are not convinced that the instructions contained any inaccurate statement of law.

### 3. Instruction on Intending Natural and Probable Consequences.

■ Gipson next contends that the superior court committed reversible error when it gave the second paragraph of the following instruction, Instruction No. 25:

Intent may be proved by circumstantial evidence. It rarely can be established by any other means. While witnesses may see and hear and thus be able to give direct evidence of what a defendant does or fails to do, there can be no eyewitness of the account of the state of mind with which the acts were done or omitted. But what a defendant does or fails to do may indicate intent or lack of intent to commit the offense charged.

It is reasonable to infer that a person ordinarily intends the natural and probable consequences of acts knowingly done or knowingly omitted.

In determining the issues as to intent, the jury is entitled to consider any statements made and acts done or omitted by the accused, and all facts and circumstances in evidence which may aid determination of state of mind.

Gipson argues that the second paragraph of the foregoing instruction improperly shifted the burden of proof on the issue of specific intent.

In *Menard v. State*, 578 P.2d 966, 968–70 (Alaska 1978), we condemned the giving of the following instruction, commonly referred to as the *Mann* charge,[1] due to the likelihood that it might be interpreted to mean that the defendant must prove his lack of intent:

"It is reasonable to infer that a person ordinarily intends the natural and probable consequences of acts knowingly done or knowingly omitted. So unless the contrary appears from the evidence, the jury may draw the inference that the accused intended all the consequences which one standing in like circumstances and possessing like knowledge should reasonably have expected to result from any act knowingly done or knowingly omitted by the accused."

Thus interpreted, the instruction could result in an impermissible shifting of the burden of proof.

As conceded by Gipson, *Menard* makes it clear that the objectionable part of the instruction given in that case was the phrase, "so unless the contrary appears from the evidence." The instruction given by the court in the instant case contained no such phrase. Nevertheless, Gipson argues that in cases such as his, where a finding of specific intent is required, such an instruction may still result in an impermissible shifting of the burden of proof, arguing that, "[W]ithout specific direction otherwise, the jury would be inclined to require a defendant to overcome the inference even without a direct instruction to that effect."

We believe Gipson's argument is without merit. Instruction No. 25, as we read it, did nothing to shift the burden of proof. All it did was inform the jury that there were *permissible inferences* that *could* be drawn from acts knowingly done, or knowingly omitted, by the defendant. Accordingly, we conclude that the instruction was proper. *See Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979).

### 4. Lesser Included Offenses.

■ Gipson next contends that the trial court erred in refusing to instruct the jury on the possibility of finding him guilty of the lesser included offense of careless use of a firearm. *See* AS 11.15.200.

---

1. *See Mann v. United States*, 319 F.2d 404 (5th Cir. 1963), *cert. denied*, 375 U.S. 986, 84 S.Ct. 520, 11 L.Ed.2d 474 (1964).

Gipson was indicted for first degree murder. The trial court instructed the jury on the elements of that offense, as well as the elements of two lesser included offenses: second degree murder and manslaughter committed by means of culpable negligence. Since the jury found Gipson guilty of second degree murder, when it was given the choice of the lesser included offense of manslaughter, it necessarily rejected his contention that the shooting was accidental. Therefore, we conclude that Gipson was not prejudiced by the trial court's failure to give his requested instruction and that any error that might have been committed, by its failure to do so, was harmless. *See Christie v. State*, 580 P.2d 310, 316–20 (Alaska 1978).

### 5. *Attorney-Client Privilege.*

■ At trial, State Trooper Investigator Harvey was permitted to testify, over objection, where Gipson's gun was found. Gipson argues that it is likely that the jury concluded that the defendant himself was the source of the information and that, therefore, his attorney-client privilege was breached.[2] We think this argument is without merit. But even if the jury did draw such a conclusion, there is no apparent prejudice since Gipson's ownership and use of the gun were undisputed.

### 6. *Compelled Pre-Trial Disclosure of Expert's Report.*

■ After the shooting Gipson threw the gun into a snow-covered field near the Lodge. The gun eventually came into the possession of Gipson's attorney. The gun was sent to a firearms expert in Minneapolis for testing. After the expert returned the gun, Gipson's attorney arranged for it to be turned over to the Alaska State Troopers. *See Morrell v. State*, 575 P.2d 1200, 1206–12 (Alaska 1978). That same day, only five days before trial, the state moved successfully for disclosure of the results of any testing that had been done on the gun.[3]

The record pertaining to this issue is quite sparse. The discovery motion was argued in an omnibus hearing on May 6, 1977, but that hearing has not been transcribed, although the log notes for the hearing are included in the record on appeal. At the hearing the judge ordered Gipson to produce the report of the firearms expert and an unidentified letter, but he limited the state's use of such evidence to cross-examination and rebuttal. The report was apparently duly produced, but it too is not part of the record on appeal.

Gipson argues that compelled production of the firearm expert's report violated his constitutional privilege against self-incrimination. He relies primarily on *Scott v. State*, 519 P.2d 774 (Alaska 1974), in which the defendant, charged with rape, challenged an order to produce names and addresses of all witnesses, to produce all written or recorded statements of witnesses, and to give advance notice to the prosecution of intent to rely on an alibi defense. In *Scott*, this court held that "extensive pretrial prosecutorial discovery in criminal proceedings" was prohibited by the constitutional privilege against compelled self-incrimination. *Id.* at 785.

In reaching that conclusion we applied a three-fold test: "Is the evidence testimonial; is it incriminating; and is it compelled?" *Id.* There is no question that the production of the expert's report in the instant case was *compelled.* It appears also that, under the broad standard approved in *Scott*, it was probably incriminating. It does not

---

2. The gun was in fact turned over to the troopers by Gipson's attorney, whose investigator had located it using information provided by Gipson. This was required by our holding in *Morrell v. State*, 575 P.2d 1200, 1206–12 (Alaska 1978).

3. It appears that the state had previously moved generally for disclosure of reports or statements of experts, since the record includes the defendant's memorandum dated April 11, 1977, in opposition to such a motion. That motion itself, however, was not included in the record on appeal.

appear, however, that the report was *testimonial*—the third requirement of the test.

In *Loveless v. State*, 592 P.2d 1206 (Alaska 1979), this court held that testimony of a psychologist regarding the defendant's conduct and mental status shortly after arrest did not violate the defendant's privilege against self-incrimination. Although the testimony in part relied on the defendant's verbal responses to questions, we held "that the evidence elicited from the [defendant] was of the nature of 'real' or non-testimonial evidence to which the right against self-incrimination does not attach." *Id.* at 1209 (footnote omitted). In the instant case, the expert's report, based on his examination and testing of the gun, is even less "testimonial" than the psychologist's testimony in *Loveless.* In fact, the report appears more akin to evidence such as fingerprints, handwriting exemplars or photographs, all of which have been determined to be beyond the privilege. *See Schmerber v. California*, 384 U.S. 757, 764, 86 S.Ct. 1826, 1832, 16 L.Ed.2d 908, 916 (1966) ("compulsion which makes a suspect or accused the source of 'real or physical evidence' does not violate [the privilege]"). The non-testimonial nature of the challenged evidence is fatal to Gipson's constitutional argument.

■■■ Gipson also contends, however, that the compelled disclosure was in violation of Criminal Rule 16(c)(2).[4] Rule 16(c)(2) provides (emphasis added):

(c) *Disclosure to the Prosecuting Attorney*

.    .    .    .    .

(2) *Reports or Statements of Experts.* The trial court may require that the prosecuting attorney be informed of and permitted to inspect and to copy or photograph any reports or statements of experts made in connection with the particular case, including results of physical or

mental examinations and of scientific tests, experiments or comparisons *which are intended by the defendant to be used at trial.* Information obtained by the state under the provisions of this section shall be used only for cross-examination or rebuttal of defense testimony.

According to the plain language of the rule, the state was entitled to the firearms expert's report only if the report was "intended by the defendant to be used at trial." Since there is no indication that Gipson ever intended to use the report at trial, we conclude that the superior court erred in compelling its disclosure.[5] *See Howe v. State*, 589 P.2d 421 (Alaska 1979).

We further conclude, however, that disclosure of the expert's report had little effect on the trial that followed. It is quite apparent, certainly, that it did not appreciably affect the jury's verdict against Gipson. The error committed was therefore harmless. *Love v. State*, 457 P.2d 622, 629–32 (Alaska 1969).

### 7. Sentence Appeal.

■■■ Gipson received a sentence of twenty years. The minimum sentence for second degree murder is fifteen years; the maximum is life. AS 11.15.030. Gipson contends that the judge improperly emphasized the punishment aspect of sentencing, and that the sentence that he imposed was excessive.

The appropriate goals of sentencing were established by this court in *State v. Chaney*, 477 P.2d 441, 444 (Alaska 1970). In his sentencing remarks the judge clearly indicated that he took these goals into consideration. The judge discussed specifically the seriousness of the crime, the necessity to deter others and to reaffirm societal norms. He took into consideration psychiatric testimony and the results of a polygraph test,

---

4. Supreme Court Order No. 329, effective January, 1979, renumbered subparagraphs (2) and (3) of Rule 16(c), as (4) and (5) respectively. For purposes of this case we shall continue to refer to them as (2) and (3).

5. The report may also have been protected by the attorney-client privilege. *See Houston v. State*, 602 P.2d 784 (Alaska 1979).

which apparently had indicated that Gipson was not consciously lying at trial. He acknowledged Gipson's progress toward rehabilitation and his first-offender status. He recommended that Gipson receive alcohol counseling and psychological treatment.

Although it certainly would have been possible for the judge to weigh the factors differently and come to a different conclusion, Gipson has not established that the sentence which was imposed was clearly mistaken. Accordingly, we will not disturb his sentence on appeal. *McClain v. State,* 519 P.2d 811 (Alaska 1974).

AFFIRMED.

RABINOWITZ, C. J., not participating.