Walter SIGGELKOW, Appellant,

v.

STATE of Alaska, Appellee.

No. 5532.

Court of Appeals of Alaska.

July 30, 1982.

Irwin Ravin, Fairbanks, for appellant.

W. H. Hawley, Asst. Atty. Gen., Anchorage, and Wilson L. Condon, Atty. Gen., Juneau, for appellee.

Before BRYNER, C. J., SINGLETON, J., and ANDERSON, District Court Judge.[*]

OPINION

SINGLETON, Judge.

Walter Siggelkow was convicted of assault in the second degree, AS 11.41.-210(a)(2). He appeals, complaining that the trial court erred in admitting certain hearsay evidence and in denying his motions for directed verdict. We find no merit in these contentions.

On January 30, 1980, Siggelkow was attempting to leave a message for his estranged wife at the apartment of his wife's brother Pat Nigro. Nigro was returning home, and recognized Siggelkow's vehicle in his driveway. Siggelkow and Nigro did not get along well, and to avoid any contact with Siggelkow, Nigro drove past his building, then circled the block. When he again reached the driveway, Siggelkow's car was no longer there, but Nigro drove on. Nigro spotted Siggelkow's car backed into an empty lot about two blocks from the apartment. According to Nigro, Siggelkow was outside the vehicle, and when he saw Nigro's pick-up truck he opened the door behind the driver's seat, removed a long-barreled gun and pointed it at the truck.[1]

There was no evidence the gun was loaded.[2] Siggelkow was fifty to seventy-five feet from the truck. Nevertheless, Nigro was afraid for his life. He told his passenger to duck, then turned the corner and drove home to call the police.

During Siggelkow's jury trial, defense counsel asked numerous questions on cross-examination of Pat Nigro concerning Nigro's precise movements after leaving his apartment and why, in particular, he had not stayed at the apartment after circling the block and finding that Siggelkow had departed. In answer to one question about why he did not just pull into the driveway the second time, Nigro replied, "I'd want to make sure that he was out of the neighborhood. My sister had warned me."[3] Some minutes later Siggelkow's counsel asked the question again, with even more disastrous results:

Q. Oh? Well, why didn't you just turn in your driveway and park when he wasn't there?

A. Because my sister had warned me that ...

Q. I'd object to that.

[Prosecutor]: Well, a minute [sic]. He asked a question. Now I think he ought to be able to answer it.

THE COURT: Overruled, Mr. Kennelly. You asked the question, he can answer the question.

A. My sister had warned me prior to that, that Walter, you know, if he got the chance he was going to kill me and he was going to kill my family also.

---

[*] Glen C. Anderson, District Court Judge, sitting by assignment made pursuant to article IV, section 16 of the Constitution of Alaska.

1. A passenger in Nigro's truck corroborated the essential details of Nigro's version of the events. Siggelkow, however, testified that he was followed by a truck with unidentified occupants, and that he got out of his vehicle in the vacant lot only to pick up the gun, which had fallen from the backseat to the floor, and place it between the front seats.

2. At trial, the judge made a specific finding that "the weapon was not loaded, that reasonable minds could not differ that the weapon was loaded."

3. Before any testimony in the case, the defense, relying on the husband-wife privilege, had successfully sought a ruling from the court preventing the prosecutor from asking Siggelkow's wife about threats her husband had made toward her brother. The judge also ruled, on hearsay grounds, that the prosecutor could not ask Nigro about threats he had learned of through his sister. During direct examination, the prosecutor asked Nigro why he was afraid when Siggelkow pointed the gun at him; Nigro began to answer, "I was—my sister had warned me...." Defense counsel objected, cutting off the answer, and the court sustained the objection.

[Defense Counsel]: I'm going to move for a mistrial, your honor.

THE COURT: Denied.

[Defense Counsel]: I asked him why he didn't park in the lot. I didn't ask him—well

. . . .

THE COURT: Ask another question.

Relying on the hearsay grounds already recognized by the trial judge in connection with the same evidence, Siggelkow argues that Nigro should not have been allowed to answer the question.

 Evidentiary rulings are reviewable only for an abuse of discretion. *Loesche v. State*, 620 P.2d 646, 651 (Alaska 1980); *Frink v. State*, 597 P.2d 154, 170 (Alaska 1979); *Lewis v. State*, 469 P.2d 689, 695 (Alaska 1970). Considering the choices available to the trial judge in this situation, we cannot say that the one chosen constituted such an abuse. Cutting off Nigro's response to the question might have left the jury with the impression that he had no reasonable explanation for his conduct. The answer did explain the conduct, and was directly responsive to the question defense counsel asked. Since the defense counsel should have been fully aware of the answer he was likely to elicit by his persistent questioning, the court's decision to permit the witness to complete his answer was not an abuse of discretion. *See generally,* J. Weinstein & M. Berger, *Weinstein's Evidence* § 103, at 103–15.[4]

Siggelkow bases the balance of his appeal on the trial judge's denial of his motions for directed verdict made at the close of the prosecution's case and again at the close of all the evidence. He argues that the state failed to prove two facts essential for conviction: that he had the specific intent to place Nigro in fear of serious bodily harm, and that the rifle was loaded.

At the time of Siggelkow's crime, the relevant portion of the statute under which he was charged, AS 11.41.210, read as follows:

(a) A person commits the crime of assault in the second degree if

. . . .

(2) he intentionally places another person in fear of imminent serious physical injury by means of a dangerous instrument.

Liability for this offense required proof of specific intent.[5] *See* 1980 Senate J.Supp. No. 44, at 4–5 (May 29, 1980).[6]

 In determining whether to grant a motion for a judgment of acquittal, the trial court must view the evidence and inferences therefrom in the light most favorable to the state and decide whether reasonable minds could conclude that guilt had been established beyond a reasonable doubt. *Hentzner v. State*, 613 P.2d 821, 823 (Alaska 1980); *Gipson v. State*, 609 P.2d 1038, 1040 (Alaska 1980); *Des Jardins v. State*, 551 P.2d 181, 184 (Alaska 1976). The same standard applies to review by an appellate court. *Hentzner v. State*, 613 P.2d at 823; *Gipson v. State*, 609 P.2d at 1040. Even where specific intent is an element of a crime, intent may be proved by circumstantial evidence, and the supreme court has approved jury instructions which state that "[i]t is reasonable to infer that a person ordinarily intends the natural and probable consequences of acts knowingly done . . . ." *Gipson v. State*, 609 P.2d at 1042; *see also Johnson v. State*, 511 P.2d 118, 125 (Alaska 1973).

 Viewed in the light most favorable to the state, the evidence at trial in the

4. Moreover, the answer was not hearsay because, in context, it served to show Nigro's state of mind, i.e., explain his conduct in fleeing and not to prove that the threat was in fact made. Alaska R.Evid. 803(3).

5. "Intentionally" is defined in the new criminal code as having a conscious objective to cause a particular result. AS 11.81.900(a)(1). The jury in this case was so instructed.

6. Under the old code, assault with a dangerous weapon was a general intent crime. An amendment to the code subsequent to Siggelkow's crime restored the placing of another in fear by means of a dangerous instrument to a general intent crime. AS 11.41.220(a) (as amended by § 5, Ch. 102 SLA 1980, effective August 1, 1980).

instant case supports the inference that Siggelkow specifically intended to place Nigro in fear of imminent serious injury. Siggelkow did not like Nigro. Although he had never visited at Nigro's home before, he went there on January 30, and apparently waited for Nigro to return. When he left the apartment he drove only two blocks, and backed into a vacant lot; when he next spotted Nigro, he pointed a gun at him. One may intend to frighten even when he does not intend to cause, and could not cause, actual physical injury. Since Nigro did not know whether or not the gun was loaded, his being placed in fear of imminent injury was a natural and probable consequence of Siggelkow's pointing the gun, and the trial judge committed no error in finding that the jury could reasonably infer that Siggelkow specifically intended to cause that fear.

█ Siggelkow's final contention is that an assault under former AS 11.41.210(a)(2) could not have been committed under these circumstances with an unloaded firearm. The relevant definition sections of the new criminal code, AS 11.81.900(b), as of January 30, 1980, read as follows:

(11) "dangerous instrument" means anything which, under the circumstances in which it is used, attempted to be used, or threatened to be used, is capable of causing death or serious physical injury; "dangerous instrument" includes "deadly weapon";

. . . .

(13) "deadly weapon" means any firearm, or anything designed for and capable of causing death or serious physical injury, including a knife, an axe, a club, metal knuckles, or an explosive;

. . . .

(21) "firearm" means

(A) a loaded or unloaded pistol, revolver, rifle, or shotgun; or

(B) any weapon, whether loaded or unloaded, designed for discharging a shot capable of causing death or serious physical injury.

Since "dangerous instrument" includes "deadly weapon," and "deadly weapon" includes "any firearm," which in turn is defined to include unloaded rifles, simple substitution yields an unambiguous statute that prohibits the use of an unloaded rifle to place another in fear of imminent serious physical injury.

A problem arises, however, in applying the definition of "dangerous instrument." The definition consists of two clauses, one setting forth a general definition and the second purporting to include a specified group of items, using the shorthand term "deadly weapon." An unloaded rifle is unarguably within the scope of the second clause. The fact that the rifle was "used" under circumstances rendering it incapable of causing serious injury, however, apparently removes it from the scope of the first clause. If the second clause is taken to be augmentative in nature, i.e., an attempt to expand the definition beyond the confines of the circumstantial dangerousness described above, Siggelkow's argument fails. If it is taken to be an attempt at clarification, this clause becomes, on its face, inconsistent with the first, insofar as it includes items not included above. The statute is then left open to the challenge that it fails to give "fair warning" to those who use unloaded firearms in this manner that such conduct is prohibited. "[T]he law-making body owes the duty to citizens and subjects of making *unmistakably clear* those acts for the commission of which the citizen may lose his life or liberty." *Snitkin v. United States*, 265 F. 489, 494 (7th Cir. 1920) (emphasis added).

Despite the rule that penal statutes are to be strictly construed against the government and in favor of the accused, we decline to follow the latter reading of the statute. Because Siggelkow's challenge to the applicability of AS 11.41.210(a)(2) is properly viewed as a constitutional challenge claiming that he was denied "fair warning" and that the statute was ambiguous, we do this without recourse to extrinsic materials.[7] There can be no claim that the

7. These materials make it clear that the legisla- ture intended to prohibit this conduct. The

legislature intended to proscribe the use of unloaded firearms only when used as a club; if this were the case, no additional clause would have been necessary, since such use is clearly within the scope of the first clause. "Strict construction does not require that statutes be given the narrowest meaning allowed by the language; rather, the language should be given "a reasonable or common sense construction, consonant with the objectives of the legislature." 3 C. Sands, *Sutherland Statutory Construction* § 59.06, at 18–19 (4th Ed. 1974), *quoted in Belarde v. Municipality of Anchorage*, 634 P.2d 567, 568 (Alaska App.1981).

We also note that we have already determined that there was evidence from which the jury could find that Siggelkow intended to place Nigro in fear, the main thrust of AS 11.41.210. His conduct is properly characterized as *malum in se* rather than *malum prohibitum*, and any claim that the statute does not give fair warning of the conduct prohibited is therefore weakened.

The degree of strictness called for in construing a penal statute may be less, however, where the function of notice and warning is assisted by common knowledge and understanding of conventional values as in the case of offenses which are malum in se. The 'fair warning' rationale is used most often in connection with statutes applying punitive sanctions for conduct which is not malum in se. 3 C. Sands, *Sutherland Statutory Construction* § 59.03, at 8 (footnote omitted).

Accordingly, we find that former AS 11.-41.210(a)(2) and AS 11.81.900(b)(11) were not so ambiguous as to deprive Siggelkow of fair warning that placing another in fear by means of an unloaded firearm, from any distance, was prohibited, and thus his conviction is AFFIRMED.

COATS, J., not participating.

---

commentary to AS 11.41.210(a)(2) adopted by the legislature in 1978 states specifically: "Note that the definition of dangerous instrument includes loaded as well as unloaded firearms." 1978 Senate J.Supp. No. 47, at 16 (June 12, 1978). The two-clause form of the definition apparently resulted from a desire to have one term ("dangerous instrument") rather than two ("dangerous instrument" and "deadly weapon"); "deadly weapon" was dropped from the tentative draft of AS 11.41.210(a)(2) (in the draft, (a)(4)), while the clause regarding "deadly weapons" was added to the definition of "dangerous weapons." Alaska Criminal Code Revision, Tentative Draft, Part 1, at 92.