NOTICE

*The text of this opinion can be corrected before the opinion is published in the Pacific Reporter.  Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska  99501*
*Fax:  (907) 264-0878*
*E-mail:  corrections@akcourts.us*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

NATHANIAL L. KANGAS,

Appellant,

v.

STATE OF ALASKA,

Appellee.

Court of Appeals No. A-12720
Trial Court No. 4TA-14-00011 CR

O P I N I O N

No. 2667 — March 27, 2020

Appeal from the Superior Court, Fourth Judicial District, Fairbanks, Paul R. Lyle, Judge.

Appearances:  Renee McFarland, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for the Appellant.  Patricia L. Haines, Assistant Attorney General, Office of Criminal Appeals, Anchorage, and Jahna Lindemuth, Attorney General, Juneau, for the Appellee.

Before:  Allard, Chief Judge, and Coats[*] and Mannheimer[*], Senior Judges.

Judge MANNHEIMER.

---

[*]  Sitting by assignment made pursuant to Article IV, Section 11 of the Alaska Constitution and Administrative Rule 23(a).

Nathanial L. Kangas shot and killed two Alaska State Troopers who had come to Tanana to arrest his father, Arvin Kangas. Kangas also used the same firearm to threaten the local Village Public Safety Officer who accompanied the two troopers, but Kangas allowed this officer to leave unharmed. Kangas subsequently removed marijuana plants and seeds from the house where the shooting occurred. A detailed description of this episode is set out in our decision in Arvin Kangas's appeal: *Kangas v. State*, unpublished, 2018 WL 2999802 at *2–3 (Alaska App. 2018).

Based on this incident, Nathanial Kangas was convicted of two counts of first-degree murder (as well as one count of third-degree assault and one count of first-degree tampering with evidence).

Because the jury found that Kangas intentionally killed the two troopers when he knew that they were acting in the performance of their duties, Kangas was subject to a mandatory term of 99 years' imprisonment on each of the murder counts. [1] And under the provisions of Alaska's consecutive sentencing statute, the superior court was required to impose these two 99-year sentences consecutively, for a composite term of 198 years' imprisonment. [2]

In this appeal, Kangas claims that one of the trial judge's instructions to the jury was improper, and that his convictions must therefore be reversed. For the reasons explained in this opinion, we hold that the challenged jury instruction was proper.

Kangas also argues that his privilege against self-incrimination was violated when the superior court issued a pre-trial order under AS 12.47.070(a) — that is, an order directing that Kangas be examined by two forensic psychologists to assess his mental condition. Although the State did not overtly use the results of these mental

---

[1] *See* AS 12.55.125(a)(1).

[2] *See* AS 12.55.127(c)(2)(A).

examinations during Kangas's trial, Kangas asserts that he is entitled to a new trial because the State cannot show (beyond a reasonable doubt) that its evidence was derived completely independently from these mental examinations. In the alternative, Kangas argues that he is at least entitled to be re-sentenced, since the superior court expressly relied on the results of these examinations at Kangas's sentencing hearing.

For the reasons explained in this opinion, we conclude that these mental examinations did not violate Kangas's privilege against self-incrimination.

Finally, Kangas raises an issue pertaining to one of Alaska's sentencing statutes, AS 12.55.125(j). This statute declares that when a defendant is sentenced to a mandatory 99-year term of imprisonment for first-degree murder, the defendant is entitled to apply for a modification or reduction of their sentence after they have served one-half of the mandatory 99-year term — *i.e.*, after they have served 49½ years.

The question presented in Kangas's case is how to apply this statute to defendants who, like Kangas, have received two or more consecutive mandatory 99-year terms of imprisonment. As we explain in this opinion, we interpret AS 12.55.125(j) to mean that Kangas is eligible to apply for a modification or reduction of his sentence after he has served 49½ chronological years of his 198-year composite sentence (*i.e.*, 49½ years, without any reduction for good time credit).

*Kangas's challenge to the jury instruction which told the jurors that they were allowed to infer Kangas's mental state from the circumstantial evidence of his actions*

As we mentioned earlier, Kangas was convicted of two counts of first-degree murder based on the fact that he shot and killed the two state troopers.

One of the elements of first-degree murder — that is, one of the allegations that the State was required to prove beyond a reasonable doubt — was that Kangas acted

with an intent to kill when he shot the two troopers.[3] In other words, the State had to prove that Kangas acted with the conscious objective of causing human death.[4]

When Kangas's trial judge instructed the jurors at the conclusion of the trial, he included an instruction which told the jurors that the State was allowed to rely on Kangas's actions as circumstantial evidence of whether Kangas possessed this culpable mental state. Kangas's trial attorney did not object to this instruction, but Kangas now asserts that it was plain error for the judge to give this instruction.

The first two paragraphs of the challenged instruction read as follows:

> [A person's] mental state or state of mind may be proved by circumstantial evidence. It rarely can be established by any other means. While witnesses may see and hear ... what a defendant does or fails to do, there can be no eyewitness to the mental state or state of mind with which the acts were done or omitted. But what a defendant does or fails to do may indicate [their] state of mind or mental state or [their] lack of state of mind or mental state.

> It is reasonable to infer that a person ordinarily intends the natural and probable consequences of acts he knowingly does or knowingly omits. Any such reasonable inference is entitled to be considered by the jury in determining whether or not the prosecution has proved beyond a reasonable doubt that the defendant possessed the required state of mind or mental state.

The instruction then concluded with a third paragraph which emphasized that the jury was entitled to consider, not only the defendant's actions, but also the defendant's statements — and, indeed, "all facts and circumstances in evidence":

---

[3]   *See* AS 11.41.100(a)(1)(A).

[4]   *See* AS 11.81.900(a)(1).

In determining issues of state of mind or mental state, the jury is entitled to consider any statements made, and acts done or omitted by the accused, and all facts and circumstances in evidence which may aid [in the] determination of state of mind or mental state.

In past decisions, the Alaska Supreme Court has approved nearly identical jury instructions. *See Calantas v. State*, 608 P.2d 34, 36 (Alaska 1980), and *Gipson v. State*, 609 P.2d 1038, 1042 (Alaska 1980). But in this appeal, Kangas argues that this jury instruction constitutes plain error. Kangas offers two theories as to why the instruction is improper.

First, Kangas argues that this jury instruction is improper because it allows the jury to infer a person's culpable mental state from their actions.

Kangas notes that when the Alaska legislature enacted our current criminal code, the legislature included statutory definitions of four culpable mental states: "intentionally", "knowingly", "recklessly", and "with criminal negligence". *See* AS 11.81.900(a)(1)–(4).

Kangas further notes that these four statutory definitions do not contain any reference to circumstantial proof. That is, the definitions of these culpable mental states do not expressly provide that a person's culpable mental state (or lack of culpable mental state) may validly be inferred from their actions.

Because the statutory definitions of the four culpable mental states do not expressly authorize a jury to infer a person's mental state from their actions, Kangas argues that the Alaska legislature must have intended to restrict the role of circumstantial evidence in proving these culpable mental states.

More specifically, Kangas claims that the legislature crafted these four statutory definitions so that the government would not be allowed to rely solely on a

defendant's acts (or omissions) as circumstantial proof of the defendant's mental state. Rather, according to Kangas, any time the government relies on circumstantial evidence to establish one of the four culpable mental states defined in AS 11.81.900(a), the government's proof must consist of "more than an inference from [the defendant's] knowing conduct".

Kangas's argument is unconvincing. The purpose of the four statutory definitions is to explain *what must be proved* to establish each particular culpable mental state. But these statutory definitions do not purport to explain or control the types of evidence that can be used to establish (or rebut) the government's allegation of a culpable mental state.

It is a long-standing tenet of Alaska law that there is no legal distinction between direct evidence and circumstantial evidence. When assessing the sufficiency of the evidence to support a criminal conviction, courts apply the same standard regardless of whether the government's case is based on direct or circumstantial evidence. [5]

As our supreme court declared in *Sivertsen v. State*, 981 P.2d 564, 567 (Alaska 1999), "In the case of a specific-intent crime, the jury is permitted to infer intent from circumstantial evidence such as conduct". Indeed, in *Calantas v. State*, 608 P.2d at 36, our supreme court expressly approved a jury instruction that "clearly informed the jurors that ... it was permissible to infer that the defendant intended to kill his victims

---

[5]    *Des Jardins v. State*, 551 P.2d 181, 184 (Alaska 1976); *Ashley v. State*, 6 P.3d 738, 743 (Alaska App. 2000). *See also Alakayak v. British Columbia Packers, Ltd.*, 48 P.3d 432, 450 (Alaska 2002) ("The plaintiff's evidence of a conspiracy [in restraint of trade] may either be direct or circumstantial. ... [I]f the plaintiff presents only circumstantial evidence, the factfinder must make inferences from that evidence to find an antitrust conspiracy. [But] a plaintiff is not required to present any direct evidence, [and] may support his case solely with circumstantial evidence.").

from the fact that he shot them". And again, in *Ollice v. Alyeska Pipeline Service Co.*, 659 P.2d 1182, 1188–89 (Alaska 1983), our supreme court held that when a party's claim hinges on proof of a person's mental state, and when the evidence pertaining to that person's mental state is primarily circumstantial (*i.e.*, resting on inferences to be drawn from the person's conduct), a judge may properly instruct the jury on their authority to draw inferences from circumstantial evidence.

If the legislature had intended to define the four culpable mental states in a manner that would change this long-standing rule — a manner that would restrict the use of circumstantial evidence to prove the culpable mental states, or that would render circumstantial evidence insufficient as a matter of law to establish these culpable mental states — then the legislature would have said so explicitly.

For these reasons, we hold that even if the circumstantial evidence pertaining to a defendant's mental state consists solely of the defendant's actions or omissions, this evidence is legally sufficient to support an inference that the defendant acted with one or more of the culpable mental states defined in AS 11.81.900(a).

Kangas raises a separate objection to the jury instruction: he asserts that this instruction constitutes an improper judicial comment on the weight of the evidence. More specifically, Kangas argues that it is always improper for a judge to instruct a jury "that it may reasonably infer an ultimate fact from circumstantial evidence".

The record in Kangas's case does not contain any indication that the trial judge "commented on the evidence" as this phrase is normally understood. The judge never expressed any personal view regarding the weight of the evidence, or the credibility of witnesses, or the relative strength of the parties' positions.

But according to Kangas, a judge acts improperly whenever the judge tells the jury that the law allows the jurors to draw a particular inference from the evidence.

Kangas argues that such an instruction is improper because the jurors will inevitably interpret the instruction as the judge's *endorsement* of the described inference.

We find Kangas's argument unconvincing. We agree with Kangas that trial judges must avoid making statements to the jury which either expressly or impliedly convey the judge's personal views regarding how the jury should resolve the merits of the case. But one of a trial judge's tasks is to inform the jury of the rules governing their deliberations.

Although the jury instruction in Kangas's case was not taken directly from the Alaska Criminal Pattern Jury Instructions, we note that the pattern jury instructions contain an instruction (Instruction 1.15) which incorporates this same legal principle:

> A person's mental state may be shown by circumstantial evidence. It can rarely be established by any other means. Witnesses can see and hear, and thus be able to give direct evidence of, what another person does or does not do. But no one can see or hear the mental state the person had at the time the person acted or did not act. Yet what a person does or does not do may indicate that person's mental state.
>
> You may consider any statements made and acts done or not done by the person and all other facts and circumstances in evidence when determining that person's mental state.

Kangas argues that the particular wording of the instruction in his case is problematic because (according to Kangas) the second paragraph of this instruction suggested that the judge *wanted* the jury to draw inferences from his conduct. Again, here is that second paragraph:

It is reasonable to infer that a person ordinarily intends the natural and probable consequences of acts he knowingly does or knowingly omits. Any such reasonable inference is entitled to be considered by the jury in determining whether or not the prosecution has proved beyond a reasonable doubt that the defendant possessed the required state of mind or mental state.

But when an appellate court reviews claims of error involving jury instructions, the question is not whether the challenged jury instruction might contain language that could be misinterpreted. Rather, the question is whether the jury instructions, *taken as a whole*, properly informed the jury of the applicable law. [6]

As we have already explained, the jury instruction that Kangas challenges was a correct statement of the law. Furthermore, the jury instruction in Kangas's case ended with a third paragraph that emphasized the jury's authority to consider, not just Kangas's actions, but rather the entirety of the evidence when the jurors decided whether Kangas acted with an intent to kill:

In determining issues of state of mind or mental state, the jury is entitled to consider any statements made, and acts done or omitted by the accused, and all facts and circumstances in evidence which may aid [in the] determination of state of mind or mental state.

---

[6] *Lynden Inc. v. Walker*, 30 P.3d 609, 617 (Alaska 2001) ("Jury instructions are to be analyzed as a whole, rather than in isolation. In reviewing jury instructions, the relevant inquiry is whether the instructions inform the jury of the applicable law."); *Baker v. State*, 905 P.2d 479, 490 (Alaska App. 1995) ("It is true, as Baker points out, that Instruction 9 does not specifically state that these elements of complicity must be proved beyond a reasonable doubt. However, jury instructions are not to be viewed in isolation; instead, we must assess the group of instructions as a whole.").

This last part of the jury instruction is simply a special application of the general principle stated in the trial judge's other instructions to Kangas's jury: the principle that the jurors were "the sole judges" of "the credibility ... [and] the weight" of the trial testimony, and that the jurors were "the ones to finally determine what ... conclusions of fact should be [drawn]" from that testimony.

When we evaluate the trial judge's instruction on circumstantial evidence in the context of the jury instructions as a whole, we conclude that no reasonable juror would interpret the instruction as a judicial request or directive for the jurors to draw any particular inferences from Kangas's actions. Instead, the challenged instruction merely clarified the jurors' authority to draw such inferences if they believed that those inferences were justified by the evidence.

For these reasons, we reject Kangas's claim of error relating to this jury instruction.

*Kangas's claim that he was illegally subjected to pre-trial psychological evaluations, and that the statements he made during these evaluations were extracted from him in violation of his privilege against self-incrimination*

Before Kangas's trial, the superior court issued an order under AS 12.47.070(a), directing that Kangas be evaluated by two forensic psychologists to see whether Kangas suffered from any mental disease or defect that might affect his competence to stand trial or his ability to form any relevant culpable mental state.

Although Kangas's trial attorney consented to these evaluations — in fact, the defense attorney took affirmative steps to facilitate these evaluations — Kangas now argues that the superior court had no authority to order these two psychological examinations because (according to Kangas) there was no reason to believe that Kangas's mental condition would be at issue in his case. Kangas further argues that he

was compelled to incriminate himself during these examinations, and that his incriminating statements were later used against him.

According to Kangas, even though the State never directly relied on either of the two psychological evaluations at trial, the State's trial evidence inevitably must have been derived, at least in part, from Kangas's statements to the psychologists. And in any event, Kangas claims that he is entitled to be re-sentenced because the superior court relied on one of the examiner's conclusions at sentencing.

For the reasons we are about to explain, we conclude that the superior court could properly order the psychological evaluations under AS 12.47.070(a), and we further conclude that Kangas's statements during these evaluations were not compelled.

*The underlying facts pertaining to these issues*

During the investigation of Kangas's case, the prosecutors learned (from medical records) that, at the time of the homicides, Kangas was being treated by a psychiatrist for a "depressive disorder" — a disorder that left Kangas with a "low frustration tolerance". In addition, when Kangas's father, Arvin, was interviewed by investigators, he suggested that Kangas's actions might be attributable to a "lithium deficiency".

Additional evidence that Kangas potentially suffered from a mental disease or defect was contained in letters that Kangas and his father Arvin sent from jail; in their letters, both Kangas and his father mentioned Kangas's mental health problems. And when Arvin Kangas was brought to trial (a trial that preceded his son's trial), both Arvin and Kangas's mother Judy testified about Kangas's mental health problems.

Based on this information, the prosecutor in Kangas's case filed a pre-trial motion asking the superior court to issue an order under AS 12.47.070(a), directing that

Kangas be examined by two forensic psychologists to assess his mental condition on the ground that "there is reason to believe that a mental disease or defect of the defendant will ... become an issue in the case."

Kangas's defense attorney told the court that he did not oppose the requested psychological evaluations, so long as the evaluations could be scheduled so that they did not conflict with the attorney's other obligations. (That is, the defense attorney wished to attend these evaluations.)

Based on the information contained in the prosecutor's motion, and based on the defense attorney's non-opposition, the superior court issued an order for the psychological evaluations.

The court sent a copy of this order to the Alaska Psychiatric Institute in Anchorage (API), asking for two qualified psychiatrists or forensic psychologists to perform the evaluations. But the director of API informed the court that she did not have two psychiatrists or forensic psychologists on her staff who were certified to perform this type of evaluation.

After learning of the director's response, the superior court held a hearing with the prosecutor and the defense attorney. At this hearing, the two attorneys agreed that Dr. Wendy Elliott of API could perform one of the evaluations even though she was not board-certified to perform this type of work. And the attorneys informed the court that, working together, they would find a mutually agreeable psychiatrist or psychologist to perform the other evaluation.

At an ensuing hearing held two weeks later, the prosecutor and the defense attorney informed the court that they had selected Dr. David Sperbeck to perform the other evaluation.

Kangas was subsequently evaluated by both Dr. Elliott and Dr. Sperbeck. One of Kangas's defense attorneys attended both of these evaluations.

At the beginning of Dr. Elliott's session with Kangas, she informed Kangas of the nature and purpose of the evaluation, as well as the fact that she was employed by the court, and that Kangas would not be able to claim that the interview or the doctor's ensuing evaluation were confidential. Dr. Elliott also informed Kangas that she might be called to testify about the information contained in her report. Finally, Dr. Elliott told Kangas that he had a right to refuse to participate in the evaluation. After hearing all of this, Kangas agreed to participate, and Dr. Elliott performed the evaluation.

Dr. Sperbeck likewise informed Kangas that he was employed by the court, and that the information which Kangas provided during the evaluation would not be confidential — that, instead, any information that Kangas shared with Dr. Sperbeck might be included in the report that Sperbeck would send to the court. According to Dr. Sperbeck, Kangas "demonstrated an understanding and acceptance of these conditions."

The prosecutor did not call either Dr. Elliott or Dr. Sperbeck as witnesses at Kangas's trial, nor did the prosecutor introduce any portion of their reports. However, after the jury found Kangas guilty, the prosecutor and the defense attorney agreed that the two psychologists' reports should be provided to the pre-sentence investigator, and that the two reports should be attached to the pre-sentence report so that the superior court would be apprised of them.

At Kangas's sentencing, the superior court expressly referred to some of Dr. Sperbeck's conclusions when the court found that Kangas was a "worst offender" for sentencing purposes.

*Why we uphold the superior court's decision to order the psychological evaluations*

On appeal, Kangas acknowledges that he "did not object" to the superior court's order for the psychological examinations, but Kangas claims that the superior court committed plain error when it issued this order. As we are about to explain, we reject Kangas's characterization of his claim as one of "plain error". Any error was invited. But more importantly, the record shows that Kangas was not compelled to participate in the psychological evaluations against his wishes, and thus there was no error.

*Why we reject Kangas's characterization of this issue as a claim of "plain error"*

The record shows that Kangas is not entitled to make a claim of plain error. Any error here was invited by Kangas's attorney.

True, it was the prosecutor who filed the motion asking the court to order the two psychological examinations. But Kangas's attorney did not simply fail to object to the proposed order. Instead, he affirmatively told the superior court that he did *not* object — and then the defense attorney actively worked to arrange and facilitate the psychological examinations.

As we have described, when the director of the Alaska Psychiatric Institute informed the superior court that she did not have psychiatrists or forensic psychologists on her staff who were certified to conduct this type of examination, Kangas's attorney told the court that he would agree to have Dr. Wendy Elliott perform one of the examinations even though she was not board-certified in this area of practice. And Kangas's attorney then worked with the prosecutor to find a second psychologist

(Dr. David Sperbeck) to conduct the other examination. In other words, over a period of weeks, Kangas's attorney worked to promote and facilitate the psychological examinations.

Given this record, even if it was error for the superior court to order these examinations, the error was invited. And because the error was invited, we will not reverse the trial court's ruling unless it presents an "exceptional situation where reversal is necessary to preserve the integrity of the judicial process or to prevent a miscarriage of justice."[7] Kangas's case does not present this type of exceptional situation.

*Why we reject Kangas's assertion that he was unlawfully compelled to participate in the two psychological examinations*

We begin our analysis of this question by describing the United States Supreme Court's decision in *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981).

In *Estelle*, the Supreme Court held that unless a criminal defendant has either requested a psychiatric examination or has indicated that they will put their mental state at issue,[8] it is unlawful for a court to compel the defendant to participate in a psychiatric examination if the defendant's statements to the examiner can later be used against the defendant at trial or sentencing.

To make sure that a defendant's statements are not compelled, *Estelle* held that when a defendant in this situation makes statements to a psychiatric examiner, those

---

[7] *Johnson v. State*, 328 P.3d 77, 86 (Alaska 2014), quoting *Parson v. Alaska Housing Finance Corp.*, 189 P.3d 1032, 1038 (Alaska 2008); *Williams v. State*, 440 P.3d 391, 396–97 (Alaska App. 2019).

[8] *Estelle*, 451 U.S. at 466, 101 S.Ct. at 1874–75.

statements are not admissible unless the defendant, with the assistance of counsel, consented to participate in the examination after being affirmatively warned (1) that they had the right not to participate, and (2) that any statements they made during the examination could be used against them. [9] (Compare *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), where the Supreme Court laid down an analogous rule for persons subjected to custodial interrogation by the police.)

In the present appeal, Kangas asserts that he was ordered to involuntarily participate in the psychological examinations conducted by Dr. Elliott and Dr. Sperbeck, even though he had done nothing to put his mental condition at issue. Based on these assertions, Kangas argues that his statements to Elliott and Sperbeck were compelled, and that, under *Estelle*, the Fifth Amendment protected him from any later use of his statements, either by the State at his trial or by the court at his sentencing.

We reject Kangas's characterization of the record.

First, the record shows that the superior court had proper grounds for concluding that the mental examinations were authorized under AS 12.47.070(a) — *i.e.*, "reason to believe that a mental disease or defect of the defendant [would] ... become an issue in the case."

Second, the record shows that Kangas was not compelled to participate in the psychological examinations against his will.

Although the superior court issued an order directing Kangas to be examined, the court did not issue this order until after Kangas's attorney affirmatively told the court that he did not object to these examinations. And then, as we have described, the defense attorney took repeated steps in the ensuing weeks to promote and

---

[9]  *Estelle*, 451 U.S. at 467–472, 101 S.Ct. at 1874–77.

facilitate these examinations. There is no indication that the superior court ordered Kangas to do something that he was otherwise unwilling to do.

In addition, Kangas was expressly warned by at least one of the forensic psychologists that he had the right not to participate in the examination — and both of the psychologists warned Kangas that whatever he said to them would be reported to the court, and could potentially be used against him. Aided by counsel (who attended both examinations), Kangas agreed to participate in both examinations.

Accordingly, we hold that *Estelle* did not bar the use of Kangas's statements to the two forensic psychologists, and that the superior court could properly order the two psychological examinations.

*Why we interpret AS 12.55.125(j) to mean that Kangas is entitled to seek a modification or reduction of his sentence after he serves 49½ years in prison*

The jury found that Kangas intentionally killed two peace officers when he knew that they were acting in the performance of their duties. Because of these findings, the superior court was required to sentence Kangas to a mandatory term of 99 years' imprisonment on each of the two counts of first-degree murder. *See* AS 12.55.125(a)(1).

Under Alaska law, defendants who are sentenced to a mandatory 99-year term for first-degree murder are not eligible for good time credit against their sentence, nor are they eligible for discretionary parole. *See* AS 33.20.010(a)(1) and AS 33.16.-090(a)(1), respectively. As a result, Kangas must serve the entire 99 years of each murder sentence. And under Alaska's consecutive sentencing statute, the superior court was required to impose these two 99-year sentences consecutively, for a composite term of 198 years' imprisonment — again, without eligibility for parole. *See* AS 12.55.-127(c)(2)(A) and AS 33.16.090(b)(7)(A), respectively.

But under AS 12.55.125(j), defendants who receive a mandatory 99-year term of imprisonment are eligible to apply for a modification or reduction of their sentence after they have served one-half of the mandatory 99-year term — *i.e.*, after they have served 49½ chronological years.

The question presented in Kangas's case is how to apply this statute to defendants who, like Kangas, have received more than one mandatory 99-year term of imprisonment.

At Kangas's sentencing, the superior court interpreted AS 12.55.125(j) as meaning that Kangas would have to serve one-half of his 198-year composite sentence — *i.e.*, 99 years — before he would be eligible to apply for a modification or reduction of his sentence under the statute. (In other words, Kangas would not be eligible to apply until he was 119 years old.)

For the reasons we are about to explain, we construe AS 12.55.125(j) to mean that Kangas will be eligible to apply for a modification or reduction of his sentence after he serves 49½ years of his composite sentence.

The legislature enacted AS 12.55.125(j) as part of the same session law where the legislature prescribed a mandatory 99-year sentence for offenders who murder peace officers who are engaged in the performance of their duties. *See* SLA 1992, ch. 79, § 23 (mandatory 99-year sentence) and § 25 (opportunity to seek modification or reduction of the sentence after 49½ years).

The legislative history of AS 12.55.125(j) is fairly limited. At a meeting in January 1992, when the House Judiciary Committee was considering whether to enact mandatory 99-year sentences, several members of the committee (as well as several witnesses who appeared before the committee) discussed the desirability of creating a

"safety valve" that would allow judges to alter a mandatory 99-year sentence. [10] At a second meeting of the committee two days later, a witness representing the Alaska Action Trust proposed a provision that would allow such defendants to apply for a modification or reduction of their sentence halfway through their mandatory term, giving these defendants the opportunity to prove that they had been rehabilitated. [11] (This witness later submitted a position paper on behalf of the Alaska Action Trust further explaining this proposal.) [12]

On January 27, 1992, the House Judiciary Committee unanimously adopted an amendment to House Bill 396 that incorporated this suggestion. [13] This provision ultimately was enacted as AS 12.55.125(j).

However, with regard to the situation posed by Kangas's case — *i.e.*, cases where a defendant has received two or more mandatory 99-year sentences — the legislative history is silent. It does not appear that the Judiciary Committee (or any other legislative committee) ever discussed how this provision would be applied to defendants who received more than one 99-year sentence.

---

[10] Recording of the House Judiciary Committee proceedings of January 22, 1992 commencing at 9:54 a.m., @ 1:00:25 – 1:15:30 (consideration of House Bill 396): http://www.akleg.gov/ftr/archives/1992/HJUD/03-HJUD-920122.mp3

[11] Recording of the House Judiciary Committee proceedings of January 24, 1992 commencing at 9:40 a.m., @ 30:11 – 30:35 (consideration of House Bill 396): http://www.akleg.gov/ftr/archives/1992/HJUD/05-HJUD-920124.mp3

[12] Position paper of the Alaska Action Trust regarding House Bill 396 (January 26, 1992), pages 5–6.

[13] Recording of the House Judiciary Committee proceedings of January 27, 1992 commencing at 10:19 a.m., @ 7:10 – 7:15: http://www.akleg.gov/ftr/archives/1992/HJUD/07-HJUD-920127.mp3

We further note that it was not until twelve years later (in 2004) that the legislature enacted AS 12.55.127, the statute which requires that all of a defendant's mandatory 99-year terms be imposed consecutively. *See* AS 12.55.127(c)(2)(A). We have found nothing in the legislative record to indicate that the legislature ever considered how this requirement of consecutive sentencing would affect a defendant's eligibility to apply for a modification or reduction of a mandatory 99-year sentence under AS 12.55.125(j).

We acknowledge that the policy behind the legislature's actions points in two directions.

When the legislature enacted mandatory 99-year sentences for the murder of a police officer, and when the legislature later required consecutive sentencing for defendants who murder more than one officer, the legislature obviously intended to express society's most severe condemnation of this type of murder, and to ensure that the defendant's sentence fully reflected the value of each individual officer's life.

On the other hand, any sentence of 99 years without possibility of parole, and without any reduction for good time credit, effectively means that even the youngest of offenders will spend the rest of their days in prison, and will die there. The legislature's decision to allow such defendants to seek modification or reduction of their sentence after serving a full 49½ years in prison demonstrates the legislature's acknowledgement that, over the course of half a century, an offender's thinking and behavior might be altered to the point where the defendant was no longer a danger to society, so that the defendant's term of imprisonment might be reduced, or the defendant might be released on parole.

Neither the language of AS 12.55.125(j) nor the pertinent legislative record provides a clear answer as to which of these policies the legislature considered paramount in situations where a defendant receives two or more mandatory 99-year

sentences. Given this ambiguity, and because AS 12.55.125(j) is a penal statute, we are required to construe AS 12.55.125(j) against the government. [14]

We accordingly hold that, even when a defendant has received two or more consecutive mandatory 99-year sentences for the crime of first-degree murder, the defendant is eligible to apply for a modification or reduction of their composite sentence under AS 12.55.125(j) after the defendant has served 49½ chronological years of their sentence.

*Conclusion*

The judgement of the superior court is AFFIRMED, but Kangas will be eligible to apply for a modification or reduction of his sentence under AS 12.55.125(j) after he serves 49½ years.

---

[14] *See State v. Andrews*, 707 P.2d 900, 907 (Alaska App. 1985), opinion adopted by the supreme court in *State v. Andrews*, 723 P.2d 85, 86 (Alaska 1986) ("Ambiguities in criminal statutes must be narrowly read and construed strictly against the government."); *see also Wells v. State*, 706 P.2d 711, 713 (Alaska App. 1985) ("It is well established that, in accordance with the rule of lenity, ambiguities in penal statutes must be resolved in favor of the accused.").