NOTICE

*The text of this opinion can be corrected before the opinion is published in the* *Pacific Reporter.* *Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections @ akcourts.gov*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

BYRON F. GEISINGER,

Appellant / Cross-Appellee,

v.

STATE OF ALASKA,

Appellee / Cross-Appellant.

Court of Appeals Nos. A-12682 & A-12691
Trial Court No. 4FA-11-02842 CI

O P I N I O N

No. 2707 — July 30, 2021

Appeal from the Superior Court, Fourth Judicial District, Fairbanks, Bethany S. Harbison, Judge.

Appearances: Brooke V. Berens, Assistant Public Advocate, and James Stinson, Public Advocate, Anchorage, for the Appellant. Nancy R. Simel, Assistant Attorney General, Office of Criminal Appeals, Anchorage, and Kevin G. Clarkson, Attorney General, Juneau, for the Appellee.

Before: Allard, Chief Judge, Mannheimer, Senior Judge,[*] and McCrea, District Court Judge.[**]

---

[*] Sitting by assignment made pursuant to Article IV, Section 11 of the Alaska Constitution and Administrative Rule 23(a).

[**] Sitting by assignment made pursuant to Article IV, Section 16 of the Alaska Constitution and Administrative Rule 24(d).

Judge MANNHEIMER.

In the late afternoon of September 9, 2006, Byron F. Geisinger was driving his truck on Chena Hot Springs Road outside of Fairbanks. In the road ahead of Geisinger, at the bottom of a hill, a family of tourists had parked their car at the side of the road to enjoy a view of the mountains. As Geisinger's truck approached the bottom of the hill where the tourists' car was parked, Geisinger first moved left, as if to go around the parked car, but then Geisinger steered sharply to the right, across the fog line on the side of the road, and plowed dead-center into the rear of the rented car without braking — striking it with such force that its trunk was completely crushed, like an accordion, all the way to the back of the front seat. As described by one witness, Geisinger's truck was literally "embedded in the rear of the [other] vehicle."

The father of the family, who was sitting in the back seat of the car, was killed instantly. The adult son of the family, who was driving the car, and his mother, who was in the front passenger seat, both suffered significant injuries. After Geisinger learned that the passenger in the back seat was dead, Geisinger walked away from the scene of the collision, into the woods, without identifying himself. Geisinger hid from the authorities for the next fifteen hours, until he finally contacted the state troopers and gave himself up.

Based on this episode, Geisinger was convicted of six offenses: manslaughter, two counts of first-degree assault, driving under the influence, leaving the scene of an injury accident, and second-degree forgery (based on the fact that, when the state troopers examined Geisinger's glove compartment, they found a forged auto insurance document which falsely indicated that Geisinger's truck was insured). Geisinger received a composite sentence of 16½ years to serve (21½ years with 5 years suspended).

After the superior court entered judgement against him, Geisinger appealed his sentence but not his convictions. This Court affirmed Geisinger's sentence in *Geisinger v. State*, unpublished, 2010 WL 5186081 (Alaska App. 2010).

About one year later, in October 2011, Geisinger filed an application for post-conviction relief in which he raised several claims that his trial attorney and his appellate attorney had represented him incompetently. The superior court granted relief on some of these claims, and the court rejected others.

Geisinger now appeals several portions of the superior court's decision that are adverse to him, while the State has filed a cross-appeal challenging the portions of the superior court's order that granted relief to Geisinger.

For the reasons explained in this opinion, we reverse the portions of the superior court's decision that granted relief to Geisinger, and we affirm the portions of the superior court's decision that denied relief to Geisinger.

*A summary of the trial evidence pertaining to the collision*

The collision in this case occurred on Chena Hot Springs Road, about eight miles outside of Fairbanks. The weather was good, and a family of tourists — the Kim family — parked their car at the side of the road to enjoy a view of the Alaska Range.

Geisinger lived in a trailer on Chena Hot Springs Road, and he was driving home in his truck after stopping for a couple of beers at the Hideout Lounge in Fairbanks. Geisinger's truck was not roadworthy: A few days earlier, Geisinger had discovered that brake fluid was leaking from a hole in the brake hose leading to his left-front wheel, so he attached vise grips to the brake hose to clamp it shut. This cut off the flow of brake fluid to the left-front wheel — leaving the brake caliper on that wheel inoperative.

The two people who were in the vehicle directly behind Geisinger testified that, during the ten or fifteen minutes before the collision, Geisinger's truck repeatedly "swerv[ed] back and forth [across the roadway] very erratically" for no apparent reason. According to these witnesses, Geisinger would veer into the oncoming lane of travel for a few seconds, then return to his proper lane, and then sometimes swerve so far to the right so that his passenger-side wheels were in the gravel by the side of the road.

Geisinger's journey home took him past the Kims' car. Although one witness testified that the Kims' car was parked completely off the road, the evidence most favorable to Geisinger was that a portion of the Kims' car — somewhat less than half its width — remained in the lane of travel, while the rest of the car was over the fog line to the right of the road.

However, the traffic lanes of Chena Hot Springs Road were standard highway width (12 feet between the fog lines and the center line). The motorist who was traveling directly in front of Geisinger testified that she drove her minivan past the Kims' parked car with plenty of room to spare — that, in fact, she could have gone past the parked car without leaving her lane of travel.

After this motorist drove her minivan around the Kims' parked car, she looked in her rearview mirror and saw Geisinger's truck behind her. According to this motorist's testimony, it looked as if Geisinger was going to drive safely around the parked car, when "all of a sudden, [Geisinger] veered [to the right] real fast, and that's when he rear-ended the [parked] car." The motorist added that there was no traffic coming from the opposite direction; in other words, there was no apparent reason for Geisinger to suddenly veer his truck to the right.

This motorist's testimony was corroborated by the two people in the vehicle directly behind Geisinger. According to these two witnesses, as Geisinger's truck approached the parked car, Geisinger steered his truck to the left, into the oncoming lane,

as if to go around the parked car — but then Geisinger veered to the right, slanting across his proper lane of travel, all the way to the right side of the road where the parked car was sitting. Geisinger then rammed his truck into the rear of the parked car, dead-center. There was no damage to the side of the parked car; rather, Geisinger hit the car from straight behind.

Geisinger did not apply his brakes before the crash. According to the driver of the vehicle behind him, Geisinger's brake lights did not come on until after the crash.

This driver's testimony was corroborated by an accident investigator for the Fairbanks Police Department who evaluated the crash site at the request of the state troopers. The accident investigator found both gouge marks and tire skid marks on the pavement — but, with one exception, all of those marks were left by the tires of the Kims' parked car when it was struck from behind by Geisinger's truck.

(The investigator concluded that, most likely, the Kims' car had been in "park" when Geisinger hit it — because, if the Kims' car had been in "drive" when it was hit, the car probably would have been pushed forward by the force of the collision instead of being crushed.)

The one tire skid mark that was not attributable to the Kims' parked car was a single "yaw" mark. (A yaw mark is a type of skid mark that is created when a still-rotating tire is rubbed across the pavement at an offset angle — *i.e.*, an angle that is different from the vehicle's direction of travel. Such marks may be left on the pavement when, for example, a vehicle changes direction abruptly, or when a driver applies the brakes but one wheel continues to rotate, and the vehicle veers to the side.)

The accident investigator testified that the single yaw mark in the roadway was created by Geisinger's left-front tire — the tire which, as we have explained, was mounted on a wheel that had no functioning brake. There were no other tire marks associated with Geisinger's truck. Because none of Geisinger's other tires left skid

marks, the accident investigator concluded that Geisinger either did not brake, or did not brake significantly, prior to the impact.

Indeed, when Geisinger's defense attorney hired an accident reconstruction expert to analyze the evidence and formulate possible theories as to how and why the collision took place, this expert concluded that, most likely, the collision was not an accident — that, instead, Geisinger deliberately rammed into the back of the parked car.

(Geisinger's attorney did not call this witness to testify at trial. Rather, the expert's report came to light during the post-conviction relief proceedings, as we will explain.)

*Why we reverse the superior court's finding that Geisinger's trial attorney was incompetent for failing to elicit testimony from a witness who heard Geisinger say that he was leaving the scene of the collision so that he could call 911*

One of Geisinger's claims for post-conviction relief was that his defense attorney performed incompetently when the attorney failed to elicit certain testimony from Adam Sagers, a driver who came upon the scene of the collision and spoke with Geisinger as he was walking away from the scene.

At grand jury, Sagers testified that when he came upon the scene of the collision, he saw a man (later identified as Geisinger) walking away from the scene. According to Sagers's testimony, he pulled his vehicle over, got out, and approached Geisinger. Sagers said to Geisinger, "Hey, where [are] you going? You're hurt; you need to get back over here" — to which Geisinger replied that "he was going to call for help, going to call 911."

But later, when Sagers testified at Geisinger's trial, neither the prosecutor nor the defense attorney asked Sagers about Geisinger's statement that he was leaving

the crash site because he was "going to call 911". Sagers testified only that he saw Geisinger walking away from the scene, that he told Geisinger to come back because he needed medical help, and that Geisinger then returned to the crash site with him.

(The trial evidence also showed that Geisinger left the scene again soon afterwards — and that, instead of calling 911 or engaging in other conduct to obtain aid for himself or others, Geisinger went into the woods and hid from the authorities until the next day.)

### (a) *The litigation of this issue in the superior court*

In the superior court, Geisinger's post-conviction relief attorney contended that any reasonably competent defense attorney would have elicited hearsay testimony from Sagers about Geisinger's statement that he was "going to call 911".

According to the post-conviction relief attorney, Geisinger's statement to Sagers was admissible for the truth of the matter asserted under Alaska Evidence Rule 803(3) (the hearsay exception for statements in which a person describes their then-existing state of mind). And the post-conviction relief attorney argued that it was crucial for Geisinger's trial attorney to introduce this evidence, because Geisinger's out-of-court statement would have supported the argument that, even though Geisinger left the scene of the collision, he was nevertheless trying to comply with his statutory duty of rendering reasonable assistance to the other people who were injured in the collision.

In response to this accusation of incompetence, Geisinger's trial attorney, William Spiers, testified (both in an affidavit and later at the evidentiary hearing) that he had consciously decided *not* to elicit testimony from Sagers concerning Geisinger's statement that he was walking away from the scene because he was "going to call 911". Spiers gave two main reasons for this decision.

One of Spiers's reasons for not eliciting this hearsay evidence was Spiers's conclusion that the evidence would not materially aid the defense.

Even though Geisinger told Sagers that he was leaving the scene so that he could call 911, the evidence was uncontroverted that, after Geisinger accompanied Sagers back to the scene of the collision, he soon learned that one of the passengers in the other car was dead — and, upon learning this, Geisinger left the scene a second time. This time, Geisinger slipped away unnoticed, and he made no attempt to summon additional assistance. Rather, he hid from the authorities who came to his house and tried to contact him, and he did not surrender himself until the next day.

Spiers testified that, in light of this evidence, he concluded that it would not appreciably help the defense case to elicit Sagers's testimony concerning what Geisinger initially said about his reason for leaving the scene.

Spiers's second reason for not eliciting this evidence was that Spiers concluded that he would violate his ethical duty as an attorney if he elicited this hearsay testimony from Sagers.

At the post-conviction evidentiary hearing, Spiers testified that when he interviewed Geisinger during the preparation of the defense case, Geisinger admitted that he left the scene, not for the purpose of calling 911, and not because he wanted to help anybody, but rather "because he was frightened, because ... he knew he had done something horrible, and [because] he didn't want anybody to come into contact with him, and he didn't want anybody to [administer] a DataMaster or a Breathalyzer [test]. He didn't want anybody to know what his physical condition was."

By the time of this evidentiary hearing (October 2015), Spiers could no longer recall precisely why he decided not to use Sagers's testimony to elicit Geisinger's out-of-court statement about calling 911. But in the pre-hearing affidavit that Spiers submitted two years earlier (in November 2013), Spiers stated that he decided

not to elicit this hearsay testimony from Sagers because he "was unwilling to advance a completely false statement of fact ... to the judge and jury in violation of my oath as an Alaska attorney[.]"

See Alaska Professional Conduct Rule 3.3(a)(3), which prohibits lawyers from "offer[ing] evidence that the lawyer knows to be false", and which also authorizes lawyers to "refuse to offer evidence, other than the testimony of a defendant in a criminal matter, that the lawyer reasonably believes is false."

On its face, Rule 3.3(a)(3) prohibits a lawyer from introducing evidence "that *the lawyer* knows to be false", and it grants lawyers the authority to "refuse to offer evidence ... that *the lawyer* reasonably believes is false" (other than the testimony of a criminal defendant). But during the post-conviction relief litigation in this case, Geisinger's attorneys took the position that Rule 3.3(a)(3) only prohibited an attorney from knowingly introducing *perjured* testimony — *i.e.*, testimony that *the witness* knows to be false. Here is the pertinent excerpt from Geisinger's pleading:

> Under the relevant provisions of Alaska Rules of Professional Responsibility 3.3, an attorney must not knowingly make a false statement of fact or law or offer evidence the lawyer knows to be false. There is no reason to believe that Mr. Sagers committed perjury when he testified at grand jury that Mr. Geisinger said he was walking away to get help ... . [Thus], [c]ontrary to Mr. Spiers' assertion, introducing Mr. Sagers' exculpatory grand jury testimony would not have violated any ethical rules[, nor] would arguing the logical inferences from this evidence. Mr. Spiers was ineffective for failing to introduce this evidence which would have proved that Mr. Geisinger did not violate the statute [requiring motorists to render aid to the victims of an injury accident].

When the superior court made its ruling on this issue, the court adopted Geisinger's interpretation of Rule 3.3(a)(3). The court concluded that even if Spiers knew or reasonably believed that Geisinger's statement to Sagers was false, Rule 3.3(a)(3) did not apply to this situation because the witness who would be giving the testimony, Sagers, did not know that the out-of-court statement was false. The superior court reasoned that, because Sagers would be honestly reporting what Geisinger had said to him, Rule 3.3(a)(3) did not authorize Spiers to decline to elicit this testimony from Sagers — and that Spiers therefore acted unreasonably when he failed to elicit Sagers's testimony about Geisinger's out-of-court statement:

> Mr. Spiers' explanation [for not eliciting this evidence] is not reasonable. Geisinger's statements [to Sagers] could have been introduced through the testimony of Mr. Sagers because it was a description of Geisinger's then-existing state of mind and/or was an excited utterance, which would avoid both the hearsay problem and any concern about perjured testimony. The court therefore concludes that there was admissible evidence that Geisinger [made this statement to Sagers].

Based on this analysis, the superior court concluded that Spiers performed incompetently when he failed to elicit testimony from Sagers concerning Geisinger's statement that he was leaving the scene for the purpose of calling 911.

At the same time, however, the court concluded that the defense attorney's handling of this matter was harmless beyond a reasonable doubt.

The court found that even if Sagers's testimony had been elicited at trial, there was "no reasonable possibility" that Geisinger would have been acquitted of failing to render assistance, or that he would have received a lesser sentence. As the court explained, "The evidence of failing to render reasonable assistance was overwhelming,

and the fact that Geisinger may have told Mr. Sagers that he was going for help does not alter the uncontroverted evidence that he did not actually take any action to help the victims."

(Although the superior court did not explicitly say so, this final portion of the court's ruling was, in effect, an endorsement of Spiers's second reason for not eliciting Sagers's testimony about Geisinger's out-of-court statement — *i.e.*, Spiers's conclusion that, given the uncontradicted evidence that Geisinger hid from the authorities instead of doing anything to seek help for the injured motorists, it would not appreciably help the defense case to elicit Sagers's testimony that Geisinger initially said he was leaving the scene for the purpose of calling 911.)

### (b) The error in the superior court's decision

On appeal, both parties challenge the superior court's ruling. The State argues that the superior court was wrong to conclude that Spiers's handling of this matter was incompetent. Geisinger, for his part, argues that the superior court was wrong to conclude that there was no prejudice to the defense's case.

For the reasons we are about to explain, we agree with the State that the superior court was wrong to conclude that Geisinger's defense attorney acted incompetently with regard to this matter.

It is true, as the superior court noted, that Geisinger's statement to Sagers was apparently admissible under Alaska Evidence Rule 803(1), because Geisinger's statement purported to be a description of his then-existing state of mind. See our explanation of Evidence Rule 803(1) in *Davis v. State*, 133 P.3d 719, 727–29 (Alaska App. 2006).

But the remainder of the superior court's ruling — the court's conclusion that Spiers should have elicited this testimony from Sagers — was based on a mistakenly narrow interpretation of Alaska Professional Conduct Rule 3.3(a)(3).

Contrary to the superior court's ruling in this case, Professional Conduct Rule 3.3(a)(3) is not limited to perjury — *i.e.*, testimony that the *witness* knows to be false. Rather, this rule covers all evidence that the *lawyer* knows or reasonably believes to be false.[1] If the lawyer knows that the evidence is false, Rule 3.3(a)(3) prohibits the lawyer from offering the evidence. And in cases of lesser certainty, where the lawyer may not "know" that the evidence is false but the lawyer reasonably believes that the

---

[1] *See* Ronald D. Rotunda and John S. Dzienkowski, *Legal Ethics: The Lawyer's Deskbook On Professional Responsibility* (2018–2019 edition, available on Westlaw), § 3.3-4 "The Lawyer's Duties in Offering Evidence to a Tribunal":

When a lawyer has knowledge that evidence is false, the lawyer must refuse to offer the evidence. For example, if a client informs the lawyer that the client fabricated a document that is relevant and would be admitted into evidence if it were not made-up, the lawyer must refuse to [sub]mit the document.
. . .

The purpose of these provisions is clear. Lawyers as officers of the tribunal must not participate in misleading the court or jury even when the client insists that the lawyer do so.

If a lawyer reasonably believes that evidence is false, but does not "know," Rule 3.3(a)(3) provides that the lawyer may refuse to offer the evidence. This provision leaves up to the discretion of the lawyer whether to seek admission of questionable evidence. ... This Rule permits a lawyer's decision to override client choice on whether to admit the evidence.

evidence is false, Rule 3.3(a)(3) authorizes the lawyer to refuse to offer the evidence (unless the evidence in question is the personal testimony of a criminal defendant).[2]

Returning to the facts of Geisinger's case: Geisinger claimed that he was entitled to post-conviction relief because his trial attorney, Spiers, failed to have Sagers testify about Geisinger's out-of-court statement that he was leaving the scene of the collision for the purpose of calling 911. Geisinger asserted that, under Evidence Rule 803(3), this out-of-court statement was admissible for the truth of the matter asserted, and that this statement would therefore have given Geisinger a potential defense to the charge that he failed to render reasonable assistance to the other people who were injured in the collision. Geisinger further asserted that Spiers had no good reason to refrain from eliciting this testimony from Sagers — and that Spiers's failure to do so was therefore incompetent.

When the superior court issued its ruling on this matter (the ruling that we quoted earlier on page 10), the court did not dispute or otherwise call into question Spiers's testimony about his pre-trial conversations with Geisinger. And based on the superior court's reference to "concern about perjured testimony", it appears that the court found that Spiers either knew or reasonably believed that Geisinger's statement to Sagers was false — *i.e.*, that Geisinger lied to Sagers about his reason for leaving the scene of the collision.

If Spiers actually *knew* that Geisinger's out-of-court statement was false, then Professional Conduct Rule 3.3(a)(3) would prohibit Spiers from introducing evidence of this out-of-court statement for the truth of the matter asserted. But even if

---

[2]  Rule 3.3(a)(3) also requires a lawyer to "take reasonable and timely remedial measures, including, if necessary, disclosure to the tribunal", if the lawyer later comes to know of the falsity of any material evidence that the lawyer has introduced, or that the lawyer has offered through the testimony of any witness (including their own client).

Spiers only reasonably believed that Geisinger's statement to Sagers was false, Rule 3.3(a)(3) authorized Spiers to refuse to elicit Sagers's testimony about this statement.

We also note that, aside from a lawyer's duty of candor to a tribunal, the commentary to Alaska Professional Conduct Rule 3.3(a) recognizes that it is often tactically advantageous for a lawyer to avoid offering evidence that the lawyer reasonably believes to be false, because "offering such [evidence] may reflect adversely on the lawyer's ability to discriminate in the quality of evidence and thus impair the lawyer's effectiveness as an advocate." Here, Spiers testified that he concluded that Sagers's testimony about Geisinger's out-of-court statement would not materially aid the defense, given the obvious incongruity between Geisinger's statement to Sagers and Geisinger's ensuing actions (*i.e.*, the undisputed evidence that Geisinger not only failed to call 911 but also hid from the authorities for fifteen hours).

We therefore conclude that Spiers acted reasonably (and competently) when, under the authority of Professional Conduct Rule 3.3(a)(3), he declined to elicit Sagers's testimony about Geisinger's out-of-court statement.

We also note that the superior court appears to have implicitly endorsed Spiers's conclusion that introducing this evidence would not help Geisinger's defense — because the court concluded that even if Spiers had introduced this testimony, there was no reasonable possibility that the testimony would have affected the outcome of Geisinger's case. As the court noted in its decision, the evidence that Geisinger failed to render reasonable assistance to the victims of the collision "was overwhelming", and "the fact that Geisinger may have told Mr. Sagers that he was going for help does not alter the uncontroverted evidence that [Geisinger] did not actually take any action to help the victims."

*Geisinger's claim that Spiers was incompetent for failing to ask for a jury instruction on the potential defense that Geisinger was too injured to be able to render assistance to the other people involved in the crash*

One of the charges against Geisinger was that, having been the operator of a vehicle involved in an injury accident, Geisinger failed to remain at the scene and render reasonable assistance to the people injured in that accident. [3] The statute defining this crime, AS 28.35.060(c), provides an exception if the operator of the vehicle is "incapacitated by the accident to the extent that the person is physically incapable of complying with the requirement [of providing reasonable assistance]."

In his petition for post-conviction relief, Geisinger claimed that his trial attorney, Spiers, was incompetent for failing to seek a jury instruction on this potential defense to the charge of leaving the scene of the accident.

When Geisinger's post-conviction relief attorney questioned Spiers about this matter, Spiers agreed that Geisinger had been injured in the collision (specifically, that Geisinger's mouth and front teeth were injured). But Spiers explained that these injuries did not incapacitate Geisinger. Spiers testified that when he conferred with Geisinger about these injuries, Geisinger told Spiers that "[he] didn't really think it was a big deal, except that it was painful."

Under questioning from Geisinger's post-conviction relief attorney, Spiers conceded that there was a possibility that Geisinger had sustained a closed-head injury in the collision — not in the sense that there was any affirmative evidence that Geisinger had suffered such an injury, but only in the sense that Spiers might plausibly argue that the evidence failed to rule out this possibility.

---

[3]  *See* AS 28.35.060(a)–(c).

(In fact, Geisinger initially raised a post-conviction relief claim based on Spiers's failure to present expert testimony regarding a potential closed-head injury, but Geisinger withdrew this claim before the evidentiary hearing.)

Spiers ultimately decided to argue to the jury, not that Geisinger was physically incapacitated by the collision, but rather that he was excused from providing assistance to the other people "because no more help was needed", given the fact that several other motorists quickly stopped at the scene, notified the authorities, and rendered assistance to the injured people until EMTs arrived on the scene.

Based on the evidence presented at the post-conviction relief evidentiary hearing, the superior court ruled that Spiers was incompetent for failing to request a jury instruction on incapacitation as a defense to the charge of leaving the scene of an injury accident. However, the court concluded that Spiers's failure to pursue such an instruction was harmless beyond a reasonable doubt. Specifically, the superior court found that "there was no reasonable possibility that Geisinger would have been acquitted of this charge", because the trial evidence "did not provide any reason to believe that Geisinger was incapacitated by the accident to the extent that he was physically incapable of complying with the requirement [of remaining at the scene and rendering reasonable assistance]."

We question whether the superior court was justified in declaring that Spiers acted incompetently when he failed to seek a jury instruction on a defense that had no reasonable support in the evidence. But in any event, we agree with the superior court that there is no reasonable possibility that a jury would have acquitted Geisinger on this basis, even if the jurors had received the proposed jury instruction.

*Geisinger's claim that Spiers was incompetent for failing to seek a jury instruction on the lesser offense of third-degree assault under AS 11.41.220(a)(4) — negligent infliction of serious physical injury by means of a dangerous instrument*

Geisinger killed one person and injured two others in the collision. With respect to the person who was killed, Yong-Ki Kim, the State charged Geisinger with manslaughter under AS 11.41.120(a)(1), under the theory that Geisinger caused this death through a reckless act.

At Spiers's request, the jury was instructed that they should consider the potential lesser offense of criminally negligent homicide under AS 11.41.130(a) — a crime that is defined by the less serious culpable mental state of criminal negligence (as opposed to recklessness). [4]

With respect to the two people who were injured in the collision (Younghee Kim and her son, Edward Kim), Geisinger was charged with first-degree assault under AS 11.41.200(a)(1) — a crime defined as recklessly causing "serious physical injury" to another person by means of a dangerous instrument. We have placed the phrase "serious physical injury" in quotation marks because Alaska's criminal code employs a special meaning of this term. As defined in AS 11.81.900(b)(59), the term "serious physical injury" means one of two things.

Subsection (59)(A) of this statute defines "serious physical injury" as "physical injury caused by an act performed under circumstances that create a substantial risk of death".

---

[4] Loosely speaking, the distinction between criminal negligence and recklessness under Alaska law is that a person acts with criminal negligence if they fail to perceive the danger, while a person acts recklessly if they are aware of and consciously disregard the danger (or if they fail to perceive the danger because of voluntary intoxication). *See* AS 11.81.-900(a)(3)–(4).

Subsection (59)(B) of this statute, on the other hand, defines "serious physical injury" as "physical injury that causes serious and protracted disfigurement, protracted impairment of health, protracted loss or impairment of the function of a body member or organ, or that unlawfully terminates a pregnancy".

Proof of either subsection (A) or (B) is sufficient to establish the element of "serious physical injury" under Alaska law. But in Geisinger's case, the State did not try to prove the theory defined in subsection (B) — protracted impairment of health or loss of function. Rather, the State pursued only the theory defined in subsection (A) — "physical injury caused by an act performed under circumstances that create a substantial risk of death". When, during the prosecutor's summation, he recited the statutory definition of "serious physical injury" from the jury instructions, the prosecutor expressly told the jurors, "We're not talking about the second part [of this definition]. We're talking about an act under circumstances that create a substantial risk of death."

Thus, to establish the two counts of first-degree assault in Geisinger's case (one count for each victim), the State asked the jury to find that Geisinger recklessly caused physical injury to Younghee and Edward Kim by means of a dangerous instrument, and that he did so under circumstances that created a substantial risk of death for the Kims (thus making each of the victims' injuries a "serious physical injury").

In his petition for post-conviction relief, Geisinger claimed that his trial attorney, Spiers, was incompetent for failing to pursue the same strategy that he followed with respect to the manslaughter charge — *i.e.*, seeking a jury instruction that would offer the jury the option of convicting Geisinger of a lesser degree of assault, one that required proof only of criminal negligence instead of recklessness.

Specifically, Geisinger claimed that Spiers was incompetent for failing to seek a jury instruction on the lesser offense of third-degree assault as defined in AS 11.41.220(a)(4). Under this statute, a person commits third-degree assault if, acting

with criminal negligence, they cause serious physical injury under AS 11.81.900-(b)(59)(B) to another person by means of a dangerous instrument. [5]

At the post-conviction relief evidentiary hearing, Spiers could not recall why he failed to seek a jury instruction on third-degree assault as defined in AS 11.41.-220(a)(4). And when the superior court rendered its decision in the post-conviction relief litigation, the court concluded that the trial judge would have been required to give such an instruction if it had been requested — under the theory that third-degree assault as defined in AS 11.41.220(a)(4) was a "lesser included offense" of the first-degree assault charges against Geisinger.

Under Alaska law, a trial judge is required to instruct a jury on any lesser included offenses supported by the evidence if one of the parties requests it. [6] But in Geisinger's case, third-degree assault as defined in AS 11.41.220(a)(4) was *not* a lesser included offense of the first-degree assault charges against Geisinger.

Under Alaska law, a lesser offense is "included" in a greater offense if, given the way the case was charged and litigated,

> (1) the defendant necessarily committed the lesser offense if he or she committed the charged offense in the manner alleged by the State;

---

[5] At the time of the proceedings in the trial court, the wording of the third-degree assault statute, AS 11.41.220(a)(4), referred to "serious physical injury under AS 11.81.900-(b)*(58)(B)*" (emphasis added) — because, before 2019, the definition of "serious physical injury" was found in subsection (58) of AS 11.81.900(b).

[6] *See Heaps v. State*, 30 P.3d 109, 115 (Alaska App. 2001); *Bendle v. State*, 583 P.2d 840, 843 (Alaska 1978) (defense request); *Blackhurst v. State*, 721 P.2d 645, 649–650 (Alaska App. 1986) (prosecution request).

(2) the defendant actually disputes the element or elements distinguishing the charged offense from the lesser, and

(3) the evidence would support a reasonable conclusion that the defendant is guilty of only the lesser offense and not the charged offense.

*See State v. Minano*, 710 P.2d 1013, 1016 (Alaska 1985); *Elisovsky v. State*, 592 P.2d 1221, 1225 (Alaska 1979); *Petersen v. State*, 930 P.2d 414, 433 (Alaska App. 1996); *Blackhurst v. State*, 721 P.2d 645, 648 (Alaska App. 1986).

Here, Geisinger's proposed lesser offense fails the first part of this test. Geisinger would *not* necessarily have committed third-degree assault under AS 11.41.-220(a)(4) if he committed first-degree assault in the manner alleged by the State.

As we have explained, a person commits third-degree assault under AS 11.41.220(a)(4) if, acting with criminal negligence and using a dangerous instrument, the person causes serious physical injury under AS 11.81.900(b)*(59)(B)*.

And as we have also explained, AS 11.81.900(b)(59)(B) — the second portion of the definition of "serious physical injury" — requires proof that the defendant inflicted an injury that led to serious and protracted disfigurement, protracted impairment of health, protracted loss or impairment of the function of a body member or organ, or the unlawful termination of a pregnancy. Under this portion of the definition, the State must prove that the injury led to one of these enumerated results.

But when the State prosecuted Geisinger for first-degree assault, the State relied solely on the *first* portion of the definition of "serious physical injury" — the portion found in subsection (59)(A) — which applies when a defendant causes physical injury "by an act performed under circumstances that create a substantial risk of death".

Here, the *result* of the injury is not determinative; rather, it is the *circumstances* under which the injury was inflicted.

In short, Geisinger did not necessarily commit third-degree assault under AS 11.41.220(a)(4) if he committed first-degree assault in the manner alleged by the State. While the evidence presented at Geisinger's trial might conceivably have supported a finding of "serious physical injury" as defined in subsection (59)(B), this was not an element of the State's proof. The State did not argue that the Kims' injuries were of the types listed in subsection (59)(B), and the jury had no reason to decide this issue — or even to consider this issue — when it deliberated on the first-degree assault charges in Geisinger's case.

For this reason, we conclude that Spiers was not incompetent for failing to request a jury instruction on the lesser offense of third-degree assault under AS 11.41.220(a)(4). Indeed, if Spiers had requested such an instruction, the trial judge could properly have refused to give it. *See State v. Minano*, 710 P.2d at 1016.

*Geisinger's claim that his appellate attorney was incompetent for failing to argue that the evidence presented at Geisinger's trial was not legally sufficient to support Geisinger's conviction for second-degree forgery*

Based on the forged car insurance document found in the glove compartment of Geisinger's truck, Geisinger was convicted of second-degree forgery. Geisinger was charged with this crime under the theory that, with intent to defraud, he knowingly possessed a forged instrument that purported to establish his status as an insured motorist. [7]

---

[7] *See* AS 11.46.510(a)(2) (the basic crime of forgery) and AS 11.46.505(a)(1), which elevates the crime to a C felony if the forged instrument "is or purports to be ... [any]
(continued...)

As we explained earlier in this opinion, Geisinger filed an appeal after he was convicted but, in his appeal, Geisinger did not attack any of his convictions. Instead, Geisinger only attacked his sentence.

Later, when Geisinger applied for post-conviction relief, one of his claims was that his appellate attorney, Colleen Libbey, was incompetent for failing to argue that the evidence presented at Geisinger's trial was not legally sufficient to support his forgery conviction.

At the post-conviction relief evidentiary hearing, Libbey testified that she did not pursue a claim of insufficient evidence because she concluded that this claim was unlikely to succeed. However, Libbey conceded that Geisinger's post-conviction relief attorneys had discovered some out-of-state court decisions which suggested that Geisinger's forgery conviction might have been attacked for insufficient evidence.

The pertinent clause of Alaska's forgery statute, AS 11.46.510(a)(2), declares that a person commits forgery if, having an intent to defraud, the person knowingly possesses a forged instrument.

Geisinger's post-conviction relief attorneys found out-of-state court decisions which hold that a person's knowing possession of a forged instrument, standing alone, is never sufficient to establish the element of "intent to defraud" — that this element must be established by additional evidence.

At Geisinger's underlying criminal trial, his attorney Spiers did in fact argue to the jury that the evidence failed to show that Geisinger possessed the forged insurance document with an intent to defraud. Spiers pointed out that the State had not presented any evidence to definitively prove that Geisinger was the one who altered the

_____

7   (...continued)
document which does or may evidence ... a legal right, interest, obligation, or status[.]"

insurance document, and Spiers also pointed out that the State had offered no evidence to prove that Geisinger presented the insurance document to anyone.

However, Geisinger's post-conviction relief claim went farther. Geisinger did not simply argue that the State's evidence was *unconvincing* on the question of "intent to defraud"; instead, Geisinger argued that, as a matter of law, the State's evidence was insufficient to prove this element.

In the superior court's post-conviction relief decision, the court adopted Geisinger's view of the law: that is, the court held that a person's knowing possession of a forged instrument, standing alone, was legally insufficient to establish the element of "intent to defraud" under Alaska's forgery statutes. And having adopted Geisinger's view of the law, the superior court concluded that Geisinger's proposed sufficiency-of-the-evidence attack on his forgery conviction "would likely have been successful."

Although the superior court did not expressly explain why it believed that Geisinger's attack on the forgery conviction would likely succeed, one may reasonably infer that the court concluded that, aside from the mere fact that Geisinger possessed the forged insurance document, no other evidence presented at Geisinger's trial, either singly or in combination, could reasonably support a finding that Geisinger possessed the forged document with intent to defraud.

The superior court therefore found that Libbey was incompetent when she failed to raise this issue on appeal, and the court ruled that Geisinger was entitled to re-open his appeal so that he could pursue this attack on his forgery conviction.

At a basic level of analysis, it is obvious that the forgery statute lists "intent to defraud" as an element separate from knowing possession of the forged instrument. It is also obvious that a person's knowing possession of a forged instrument does not always betoken an intent to defraud. For instance, a museum devoted to the history of law enforcement might have an exhibit of forged documents or counterfeit currency.

– 23 –                    2707

Similarly, a bank teller, recognizing that someone had just presented a forged check, might seize the check and place it in a drawer for safekeeping until it could be retrieved by a police officer.

But just as the surrounding circumstances may negate any suggestion of intent to defraud, the surrounding circumstances may establish this intent. Indeed, the government will seldom be able to establish the possessor's intent to defraud by direct evidence. Instead, proof of this element will usually hinge on the circumstances surrounding the defendant's acquisition and possession of the forged document.

The fact that proof of the "intent" element in forgery cases will typically rest on circumstantial evidence does not alter the test for whether the evidence is sufficient to support a criminal conviction. As this Court noted in *Kangas v. State*,

> It is a long-standing tenet of Alaska law that there is no legal distinction between direct evidence and circumstantial evidence. When assessing the sufficiency of the evidence to support a criminal conviction, courts apply the same standard regardless of whether the government's case is based on direct or circumstantial evidence.

*Kangas*, 463 P.3d 189, 193 (Alaska App. 2020). [8]

And, as the Washington Supreme Court noted in *State v. Vasquez*, 309 P.3d 318 (Wash. 2013), even though "possession alone is not sufficient to infer intent to injure or defraud in forgery cases, ... possession together with slight corroborating evidence might be." *Id.* at 321.

With these principles in mind, we now turn to the evidence in Geisinger's case to evaluate whether, apart from the mere fact that Geisinger knowingly possessed

---

[8]   Citing *Des Jardins v. State*, 551 P.2d 181, 184 (Alaska 1976), and *Ashley v. State*, 6 P.3d 738, 743 (Alaska App. 2000).

the forged automobile insurance document, the evidence was legally sufficient to support the jury's finding that Geisinger possessed this forged document with an intent to defraud. On this question, we are not required to defer to the superior court's ruling; rather, we assess the sufficiency of the evidence *de novo*.[9]

The evidence presented at Geisinger's trial showed that the forged insurance document was created by someone who used a valid insurance document issued to another car owner, Davina Denny, as the template.

Geisinger was a friend of Ms. Denny's ex-husband. At Geisinger's trial, Denny testified that the head gasket blew out on her car, and that she then enlisted Geisinger (who was an automobile mechanic) to work on her vehicle. To facilitate this repair work, Denny had the vehicle towed to Geisinger's residence on Chena Hot Springs Road.

Denny's vehicle was insured through the Leader Infinity Insurance Company, and the insurance documentation was in Denny's vehicle when it was towed to Geisinger's residence.

According to Denny's testimony, when the car repairs were finished, Geisinger told her that, in addition to the repair fees, she also owed him "towing fees" and "lot fees". Denny was having financial difficulties, and she could not afford to pay all of Geisinger's claimed fees, so — to satisfy her debt — she deeded the vehicle over to Geisinger. Denny never retrieved the insurance documentation from her vehicle.

When, following the collision, the state troopers searched the glove compartment of Geisinger's truck, they found a document that purported to show that Geisinger's truck was insured by the Leader Infinity Insurance Company. But the text

---

[9] *See*, *e.g.*, *Marshall v. Peter*, 377 P.3d 952, 956 (Alaska 2016) (declaring that the sufficiency of the evidence to support a trial verdict is a question of law).

of this purported insurance document contained several inconsistencies and irregularities — factors which prompted the Alaska Division of Insurance to contact the claims manager for Leader Insurance.

Although the document found in Geisinger's truck purported to be proof of a current insurance policy issued by Leader Insurance to Byron Geisinger, the claims manager discovered that the policy number on this document belonged to an expired automobile insurance policy that Leader Insurance had once issued to Davina Denny — a policy that covered a different vehicle, housed at a different address. According to the claims manager, the only authentic information on Geisinger's insurance document was the Leader policy number — and this number belonged to the expired policy previously issued to Davina Denny. All the other information on the document was false: Leader Insurance had never issued a policy to anyone named "Byron Geisinger".

Based on this evidence, a reasonable fact-finder could conclude that the forged insurance document found in Geisinger's truck was created either by Geisinger himself or by someone working on his behalf, using Denny's policy as a template.

At Geisinger's trial, his attorney, Spiers, repeatedly pointed out that Geisinger had never presented this forged insurance document to anyone, nor had he ever filed a claim on this purported insurance policy. But there was other circumstantial evidence that Geisinger possessed this forged document with intent to defraud.

Under AS 28.22.011, the owner of a motor vehicle is required to carry insurance on their vehicle, but a driver is not required to produce documentary *proof* of this insurance unless they are stopped by a police officer[10] or unless they are involved

---

[10] AS 28.22.019.

in a motor vehicle accident that results in injury or that results in property damage exceeding $501. [11]

(The reason Alaska law requires a driver to produce proof of insurance on these occasions is precisely because it is impossible to predict when one might be stopped by a police officer or one might be involved in an accident. As a practical matter, this unpredictability forces drivers to have vehicle insurance — and to carry proof of this insurance — at all times.)

In Geisinger's case, the evidence showed that Geisinger kept the forged insurance document in the glove compartment of his Ford truck, and this forged document purported to be proof that Geisinger's truck was covered by automobile insurance issued by Leader Insurance. Based on this evidence, one could reasonably infer that Geisinger intended to use the forged document for fraudulent purposes if he was ever asked to produce evidence of vehicle insurance — either by a police officer during a traffic stop, or by another driver if Geisinger got into an accident.

In sum, the State did not merely produce evidence that Geisinger knowingly possessed a forged instrument. In addition to proving that Geisinger knowingly possessed the forged document, the State presented evidence which strongly suggested that, after Geisinger acquired the template for this forged document from Davina Denny, Geisinger either personally created the forgery or he enlisted someone else to do it for him. As the Alaska Supreme Court has noted, a person's creation of a forgery is circumstantial evidence that they acted with intent to defraud. [12]

_____

[11]   AS 28.22.021.

[12]   *See Dapcevich v. State*, 360 P.2d 789, 792–93 (Alaska 1961) ("[T]he record discloses that the defendant had no legitimate reason for ever having the [treasury] warrant in his possession, that he was unknown to the payee [named in the warrant], and that he had the

(continued...)

The State also presented circumstantial evidence suggesting that Geisinger had a fraudulent purpose for retaining this forged document in his possession: the fact that the forged document purported to be evidence of a vehicle insurance policy, and that the vehicle purportedly insured by this policy was Geisinger's own truck, and the fact that Geisinger carried this forged insurance document in the glove compartment of his truck — the normal place for a driver to carry proof of their vehicle insurance.

As defined in AS 11.46.990(11), the phrase "intent to defraud" includes not only "an intent to injure someone's interest", but also "an intent to use deception". And under AS 11.81.900(b)(18)(A), "deception" includes the act of "knowingly ... creat[ing] or confirm[ing] another's false impression that the defendant does not believe to be true".

Based on the evidence presented at Geisinger's trial, reasonable jurors could conclude, beyond a reasonable doubt, that Geisinger was carrying the forged document so that he could use it to deceive a police officer, or to deceive another motorist, if he was ever in a situation where he was required to produce proof of vehicle insurance. Thus, apart from Geisinger's mere possession of the forged document, the evidence was sufficient to support the jury's finding that Geisinger possessed this forged document with "intent to defraud" as that phrase is defined in our criminal code.

We therefore reverse the superior court's decision to grant post-conviction relief to Geisinger on this issue.

---

[12] (...continued)
opportunity to purloin the warrant. Under such circumstances, if [the defendant] did forge the warrant, it is very doubtful that he had any other intent than to injure and defraud from the moment that he [stole] the warrant and [forged the name of the payee] until the time that he uttered it.").

*Geisinger's claim that his trial attorney was incompetent for failing to seek a separate trial of the second-degree forgery charge*

In advance of Geisinger's trial, the prosecutor asked the superior court to consolidate the five collision-related charges (manslaughter and two counts of first-degree assault, plus leaving the scene of an injury accident and driving under the influence) with the second-degree forgery charge (the charge based on Geisinger's possession of the forged car insurance documentation). Geisinger's attorney did not oppose the prosecutor's request, and the superior court granted the motion. Thus, all six charges were tried in a single proceeding.

When Geisinger's attorney, Spiers, was asked about this during the post-conviction relief evidentiary hearing, he replied that he had given thought to this matter, and that he ultimately decided not to oppose the State's motion for consolidation because (1) there was little chance that the joinder of the forgery charge would alter the jury's verdicts on any of the six charges, and (2) it would be better, for sentencing purposes, if the judge was imposing sentence on all of Geisinger's convictions at the same time.

When the superior court issued its decision, the court stated that "there was no tactical reason for Mr. Spiers' non-opposition to the motion to consolidate" — apparently overlooking Spiers's testimony on this matter. However, the superior court also concluded that there was no reasonable possibility that holding a separate trial on the forgery count would have made any difference to the outcome of either the forgery count or the five collision-related counts. We agree, and we therefore uphold this portion of the superior court's decision.

*Geisinger's claim that his appellate attorney was incompetent for failing to argue that Geisinger's convictions for manslaughter and first-degree assault should be reversed because of a flaw in the jury instructions*

As we have explained, when Geisinger pursued his direct appeal, his appellate attorney attacked Geisinger's sentence but not his criminal convictions. In Geisinger's application for post-conviction relief, he argued that his appellate attorney was incompetent for failing to attack his three most serious convictions (for the crimes of manslaughter and first-degree assault) on the basis that there was a flaw in the jury instructions describing the elements of those crimes.

The crime of manslaughter, as defined in AS 11.41.120(a)(1), is committed when a person "recklessly causes the death of another person". As a legal matter, this means that, in a prosecution for manslaughter, the State is required to prove (1) that the defendant acted "recklessly", as that term is defined in AS 11.81.900(a)(3), with respect to the possibility that their conduct would result in the death of another person, and (2) that the defendant's reckless conduct was a "substantial factor" in causing the death (as that term is defined in such cases as *Rogers v. State*, *Johnson v. State*, and *State v. Malone*.[13])

Similarly, a charge of first-degree assault under AS 11.41.200(a)(1) requires the State to prove (1) that the defendant, while using a dangerous instrument, (2) acted recklessly with respect to the possibility that their conduct would result in the infliction of "serious physical injury" on another person (as that term is defined in AS 11.81.900(b)(59)), and (3) that the defendant's reckless conduct was a substantial factor in causing the serious physical injury.

---

[13] *Rogers v. State*, 232 P.3d 1226, 1233–35 (Alaska App. 2010); *Johnson v. State*, 224 P.3d 105, 109–111 (Alaska 2010); *State v. Malone*, 819 P.2d 34, 36–38 (Alaska App. 1991).

Unfortunately, at the time of Geisinger's trial, the standard Alaska jury instructions on the elements of these two crimes were potentially misleading with regard to the required link between a defendant's reckless conduct and the resulting death or injury.

For instance, in Geisinger's case, the pertinent portion of the jury instruction on the elements of manslaughter read as follows:

> A person commits the crime of Manslaughter if, without legal justification, the person intentionally, knowingly, or recklessly causes the death of another person under circumstances not amounting to murder in the first or second degree.
>
> In order to establish the crime of Manslaughter, it is necessary for the state to prove beyond a reasonable doubt the following:
>
> First, that Byron F. Geisinger acted recklessly; and
>
> Second, that [he] caused the death of [Yong-Ki Kim].

Similarly, the pertinent portion of the jury instructions on the elements of first-degree assault read as follows:

> A person commits the crime of Assault in the First Degree if the person recklessly causes serious physical injury to another person by means of a dangerous instrument.
>
> In order to establish the crime of Assault in the First Degree, it is necessary for the state to prove beyond a reasonable doubt the following:
>
> First, that Byron F. Geisinger acted recklessly;

– 31 –                                                                                                    2707

Second, that [he] caused serious physical injury to another person, [Younghee Kim and Edward Kim]; and

Third, that [he] did so by means of a dangerous instrument, [to wit,] a motor vehicle.

As can be seen, these instructions informed the jury that the State was required to prove that Geisinger acted recklessly, and that Geisinger caused the results forbidden by the manslaughter and first-degree assault statutes (human death and serious physical injury, respectively), but these instructions were ambiguous as to the required linkage between Geisinger's reckless conduct and the unlawful results.

Each instruction began correctly, by stating that the charged crime was defined as "recklessly caus[ing] the death of another person" and "recklessly caus[ing] serious physical injury to another person". But then, when the instruction broke this definition down to its constituent elements, the instruction failed to explicitly point to the required link between Geisinger's reckless conduct and the forbidden result.

(We discussed this problem at some length in *Pearson v. State*, unpublished, 1997 WL 129081 at *11–13 (Alaska App. 1997), and the pattern jury instructions have since been amended in an effort to address this problem. For instance, the pattern instruction on the elements of manslaughter now declares that the State must prove that "(1) the defendant caused the death of another person; and (2) the defendant did so recklessly." See Alaska Criminal Pattern Jury Instruction 11.41.120(a)(1) (revised 2014).)

In his application for post-conviction relief, Geisinger argued that the flaw in these jury instructions was plain error (given this Court's 1997 decision in *Pearson*), and that his appellate attorney was incompetent for failing to pursue this claim of plain error.

Moreover, Geisinger also argues on appeal, based on the Alaska Supreme Court's decision in *Jordan v. State*, 420 P.3d 1143 (Alaska 2018), that all errors in jury instructions describing the elements of a crime must now be deemed "structural" — that is, such errors require reversal of a defendant's conviction even when there is no specific indication that the error affected the fairness of the defendant's trial.

Turning first to Geisinger's argument that the flaw in the jury instructions is "structural error", we reject Geisinger's broad reading of the supreme court's decision in *Jordan*.

The defendant in *Jordan* was charged with possessing four ounces or more of marijuana in his home. At trial, Jordan's defense was that he reasonably believed that his marijuana weighed less than four ounces — but the trial judge erroneously concluded that this was not a valid defense to the charge. Because of the judge's erroneous view of the law, he refused to instruct the jury on Jordan's defense, and the judge refused to let Jordan testify about why he believed that his marijuana weighed less than four ounces. [14]

Thus, as our supreme court put it, "the jury was not informed that [Jordan's] reasonableness was an issue", and "the jury had no opportunity to decide ... whether [Jordan's] defense was a reasonable one". [15]

In these circumstances, the supreme court held, the trial judge's refusal to instruct the jurors on this contested element of the offense was a structural error — *i.e.*, an error that automatically required reversal of Jordan's conviction. [16]

_____

[14]   *Jordan*, 420 P.3d at 1146–47.

[15]   *Id.* at 1156.

[16]   *Id.* at 1155–56.

But we do not read *Jordan* as requiring automatic reversal of a criminal conviction whenever there is some flaw in the jury instruction on the elements of the crime, nor do we read *Jordan* as requiring reversal of Geisinger's manslaughter and first-degree assault convictions — because Geisinger's case does not present the same kind of structural error that was present in *Jordan*.

*Jordan* involved a situation where the defendant was precluded from presenting his defense. The trial judge refused to instruct the jury that it was a defense if Jordan reasonably believed that his marijuana weighed less than four ounces, and the judge refused to let Jordan testify in support of that defense.

In Geisinger's case, on the other hand, despite the flaw in the way the jury instructions listed the individual elements of manslaughter and first-degree assault, those instructions did refer (in the first sentence of each instruction) to the fact that the two crimes were defined in terms of a defendant's "recklessly caus[ing]" a particular result.

This concept was repeated in a separate jury instruction that listed all of the charges against Geisinger. This instruction informed the jurors that Count 1 of the indictment charged that Geisinger "recklessly caused the death of another person", while Counts 3 and 4 of the indictment charged that Geisinger "recklessly caused serious physical injury to another person ... by means of a dangerous instrument, [to wit] a motor vehicle".

More importantly, when the prosecutor at Geisinger's trial delivered his summation to the jury, he repeatedly argued that Geisinger's reckless conduct — his impairment, his decision to drive when one of his brakes was not working, his manner of driving (swerving on the road from one side to the other) — had been a proximate cause of the death and the injuries.

And just as important, the text of the jury instructions, combined with the prosecutor's characterization of the law, allowed Geisinger's defense attorney to fully argue his theories of the case when the attorney delivered his summation to the jury.

Spiers pointed out that no witness had observed Geisinger drinking to excess, and (for this reason) Spiers argued that the collision "was unrelated to any drinking that happened in this case".

Spiers also argued that the collision was primarily caused by Edward Kim's negligent decision to park his rental car partially on the roadway, and Spiers suggested that Kim might have started moving his car back into the lane of travel just as Geisinger was approaching from behind. These actions, according to Spiers, provided an explanation as to why Geisinger might reasonably initially steer his car to the left as he approached the parked car, but then quickly veer back toward his right. Spiers also argued that the yaw mark that was left on the roadway by Geisinger's left-front tire was an indication that Geisinger had applied his brakes to avoid the collision.

All of this, Spiers argued, showed that the State had failed to prove beyond a reasonable doubt that Geisinger was at fault in causing the collision. Rather, Spiers argued, "Mr. Geisinger tried to avoid the accident, and he made a split-second decision, or maybe he never made a [conscious] decision at all [because everything was happening so fast]." Spiers asserted that Geisinger "made an effort to get around the [parked car], and it didn't work."

Spiers acknowledged that Geisinger's actions had contributed to causing the accident, but he suggested that the State had failed to prove that Geisinger's actions were reckless or even criminally negligent. He asked the jurors to remember that "sometimes, an accident is just that: it's an accident."

In other words, the prosecutor and the defense attorney explained the correct law to the jury when they delivered their summations — and, unlike the situation

in *Jordan*, the flaw in the jury instructions did not prevent Geisinger's attorney from presenting his chosen defense to the manslaughter and first-degree assault charges. The defense attorney was fully able to argue his defense, and the jury was fully able to consider that defense.

We addressed and rejected a similar claim of error in *Brown v. State*, 435 P.3d 989 (Alaska App. 2018) — a case that we decided four months after the supreme court issued its decision in *Jordan*.

The defendant in *Brown* was charged with criminal non-support of his children. By mistake, the jury instructions on the elements of this crime failed to expressly state that the government was required to prove that the defendant did not, in fact, pay his child support. [17]

Nevertheless, the jury instructions did refer to this element of the State's proof: the jury was told that the State had to prove that "Brown's failure to provide support for his children was knowing" and that "Brown's failure to provide support was without lawful excuse." Furthermore, the fact that Brown failed to pay his child support was uncontested. Brown's attorney affirmatively conceded that Brown had not paid his child support. Brown's entire defense was that he lacked the money to pay the child support despite his reasonable, good-faith efforts. [18]

Thus, unlike the defendant in *Jordan*, Brown was allowed to present his chosen defense, and the jury was allowed to fully consider that defense. For these

---

[17]   *Brown*, 435 P.3d at 991.

[18]   *Id.* at 991–92.

reasons, we concluded that the flaw in the jury instructions in Brown's case did not constitute structural error. [19] We reach the same conclusion in Geisinger's case.

Our discussion of Geisinger's "structural error" claim also explains most of our reasons for concluding that the error in the jury instructions did not prejudice Geisinger.

In his brief to this Court, Geisinger acknowledges that his trial attorney, Spiers, was able to present his theory to the jury that, even if Geisinger acted recklessly, Geisinger's reckless conduct was not a significant factor in causing the collision. But Geisinger argues that, because the challenged jury instructions did not explicitly identify the required causal nexus between Geisinger's reckless conduct and the ensuing collision, the jury "could not apply this defense, and ... did not have to deliberate on this element of the [crime]."

Geisinger's argument does not comport with two long-established rules of Alaska law.

The first of these rules is that a claim of error relating to jury instructions must be evaluated by reference to the content of the instructions as a whole. As we explained in *Kangas v. State*, 463 P.3d 189 (Alaska App. 2020), "the question is not whether [a particular] challenged jury instruction might contain language that could be misinterpreted. Rather, the question is whether the jury instructions, *taken as a whole*, properly informed the jury of the applicable law." (Emphasis in the original) [20]

---

[19]   *Id.* at 992.

[20]   *Kangas*, 463 P.3d at 194. *See also HDI-Gerling American Insurance Co. v. Carlile Transportation Systems, Inc.*, 426 P.3d 881, 887 (Alaska 2018) (the test for reversible error is whether "the jury instructions as a whole allow[ed] the verdict to rest on an erroneous legal theory"); *City of Hooper Bay v. Bunyan*, 359 P.3d 972, 978 (Alaska 2015) (the test is "whether the instructions [to the jury], when read as a whole, adequately inform[ed] the jury

(continued...)

The second of these rules is that an error in the jury instructions can be cured by the arguments of the parties.[21] We have already explained how the other jury instructions mitigated the claimed error, and how the arguments of the parties clarified the State's need to prove that Geisinger's recklessness was a substantial factor in causing the collision.

We therefore reject Geisinger's claim that the jury would have been unable to consider or evaluate his trial attorney's arguments as to why Geisinger should be found not guilty (or should be convicted only of criminally negligent homicide).

We also note that, in any event, the jury found Geisinger guilty of driving under the influence. Because the jury reached this verdict, it was almost inevitable that the jury would conclude that Geisinger acted recklessly when he drove his truck at highway speeds on Chena Hot Springs Road, and that his recklessness was a substantial factor in causing the collision. See *Comeau v. State*, 758 P.2d 108, 114 (Alaska App. 1988), where this Court held that, under Alaska law, a person who drives a motor vehicle on a public roadway while impaired by alcohol, in the presence of other traffic, is "necessarily guilty of driving recklessly or with criminal negligence, as those terms are defined in [Alaska's] criminal code."

In his brief to this Court, Geisinger argues that this analysis is flawed because, as we explain in the next section of this opinion, Geisinger's post-conviction relief attorney argued — and the superior court found — that Geisinger's trial attorney, Spiers, was incompetent for failing to attack the DUI charge by presenting expert

---

[20] (...continued)
of the relevant law").

[21] *See, e.g., Riley v. State*, 60 P.3d 204, 208 (Alaska App. 2002); *Norris v. State*, 857 P.2d 349, 355 (Alaska App. 1993); *O'Brannon v. State*, 812 P.2d 222, 229 (Alaska App. 1991).

testimony regarding Geisinger's likely blood alcohol level at the time of the collision. Thus, Geisinger now argues, we must assume that he was wrongfully convicted of DUI, and therefore the only theory the jury might properly have relied on, when it found that Geisinger acted recklessly, was Geisinger's act of clamping off the brake fluid to his left-front wheel.

Our first response to this argument is that (as we are about to explain in the next section of this opinion) the superior court was wrong when it found that Spiers was incompetent for failing to present expert testimony regarding Geisinger's blood alcohol level.

But more importantly, Geisinger's argument would be faulty even if he *were* entitled to post-conviction relief from his DUI conviction.

It must be remembered that this entire issue is raised as a claim that Geisinger's appellate attorney, Libbey, was incompetent for failing to attack Geisinger's manslaughter and first-degree assault convictions on direct appeal, based on the flaw in the jury instructions.

Geisinger argues that if Libbey had pursued such an attack, she would have been successful. In particular, Geisinger argues that Libbey could have shown that Geisinger was prejudiced by the flaw in the jury instructions, because Geisinger's conviction for DUI was also invalid (on the separate ground of Spiers's purported incompetence in defending Geisinger against that charge).

But on direct appeal, Libbey would not have been allowed to argue that Geisinger's DUI conviction was invalid due to Spiers's purported incompetence.

Apart from those rare instances where an attorney's incompetence is plain from the record of the underlying trial (*i.e.*, where it is clear that, even if the court held an evidentiary hearing on this issue, there could be no plausible explanation for the attorney's conduct), Alaska law forbids a defendant from raising claims of ineffective

assistance of counsel on direct appeal. Instead, such claims must be litigated in an action for post-conviction relief. *See Grinols v. State*, 10 P.3d 600, 613 (Alaska App. 2000); *Barry v. State*, 675 P.2d 1292, 1295–96 (Alaska App. 1984).

Thus, when Libbey drafted the arguments to be presented in Geisinger's direct appeal, she was stuck with the fact that the jury had convicted Geisinger of DUI. Libbey was precluded from arguing that this DUI conviction should be reversed based on the alleged incompetence of Geisinger's trial attorney. This means that, if Libbey had raised an appellate attack on the jury instructions pertaining to the elements of manslaughter and first-degree assault, she would have been required to accept Geisinger's DUI conviction as valid. This, in turn, would severely undermine any argument that Geisinger was prejudiced by the flaw in the jury instructions — because, given the facts of Geisinger's case, if Geisinger was driving under the influence, he almost certainly was driving recklessly.

For all of these reasons, Geisinger failed to establish that Libbey acted incompetently when she failed to argue on direct appeal that Geisinger's manslaughter and first-degree assault convictions should be reversed based on the flaw in the jury instructions.

*Geisinger's claim that his trial attorney was incompetent for failing to present an expert witness to testify that, if Geisinger drank only four beers during the five or more hours preceding the collision, Geisinger would have had a low blood alcohol level at the time of the collision*

One of Geisinger's claims for post-conviction relief was that his trial attorney, Spiers, was incompetent for failing to present expert testimony regarding Geisinger's likely blood alcohol level at the time of the collision. Geisinger's post-conviction relief attorneys asserted that this kind of expert testimony was readily

available, and that it would have shown that Geisinger likely had a low blood alcohol level at the time of the collision — information which, according to Geisinger's attorneys, would have altered the jury's decision as to whether Geisinger was impaired by alcohol at the time of the collision.

The question of whether Geisinger was impaired by alcohol at the time of the collision was important at Geisinger's trial for two reasons.

First, one of the charges against Geisinger was driving under the influence, AS 28.35.030. Because Geisinger fled the scene of the collision and was not taken into custody until some fifteen hours later, the State was not able to obtain a usable breath test from Geisinger. Thus, the State could not charge Geisinger under subsection (a)(2) of the DUI statute, which defines the offense in terms of a driver's blood alcohol level. Instead, Geisinger was charged under subsection (a)(1) of the statute — the subsection requiring affirmative proof of a driver's impairment.

Second, the issue of Geisinger's impairment was also relevant to the manslaughter and first-degree assault charges against Geisinger, because those charges required proof that Geisinger acted recklessly. If Geisinger was impaired by alcohol, this would be relevant to the jury's assessment of whether he acted recklessly. However, in contrast to the DUI charge (where Geisinger's impairment or lack of impairment was dispositive), the manslaughter and assault charges did not stand or fall on the issue of whether Geisinger was impaired by alcohol.

The uncontradicted evidence at trial showed that Geisinger knowingly drove his truck after he had disabled the brake on his left-front wheel. The uncontradicted evidence also showed that, in the minutes before the collision, Geisinger was driving at high speeds, and that he was swerving back and forth across the entire width of the roadway for no apparent reason. In the prosecutor's summation to the jury, he argued that Geisinger had been impaired by alcohol — but the prosecutor also argued

that, regardless of whether Geisinger was impaired by alcohol, the fact that Geisinger drove at high speeds after disabling the brake on his front wheel, and the fact that Geisinger was swerving back and forth across the road for no reason, showed that Geisinger was acting recklessly.

### (a) The conflicting trial evidence pertaining to Geisinger's alcohol consumption and his observed level of intoxication

At Geisinger's trial, there was conflicting evidence as to where, and how, Geisinger spent the five or six hours leading up to the collision, and as to whether Geisinger was intoxicated during that time.

Two witnesses — Bryce Brown, who was one of Geisinger's co-workers, and Cale White, a friend of Brown's — testified that, on the day of the collision, they visited Geisinger at his residence in the middle of the day, arriving sometime around noon and leaving Geisinger's trailer sometime between 2:30 and 3:00 p.m. (The collision occurred around 5:20 p.m.) Brown and White testified that they went to Geisinger's trailer because Brown was interested in buying a motorcycle from Geisinger.

Both Brown and White testified that Geisinger drank only one or two beers while they were with him at his trailer. However, even though Geisinger drank very little alcohol in their presence, both Brown and White testified that Geisinger was already obviously drunk. According to their testimony, Geisinger boasted that he had been out all night the evening before, and that he had spent $300 on liquor and beer.

When Brown was asked to explain why he thought that Geisinger was drunk, Brown testified that when they arrived, Geisinger was staggering, he was boisterous, he was slurring his words, and he "just kept repeating himself". Both Brown and White testified that when Geisinger decided to show Brown how the motorcycle

performed, Geisinger drove the motorcycle into a ditch. Then, after Geisinger managed to extricate the motorcycle from the ditch, Geisinger proceeded to drive the motorcycle down Chena Hot Springs Road at speeds of close to 90 miles an hour, wearing no helmet or eye protection.

In marked contrast to the testimony given by Brown and White, two of Geisinger's friends — Cory and Sara Kuryla — testified that Geisinger was visiting them at their apartment during this same time period. The Kurylas asserted that Geisinger arrived at their apartment promptly at 11:00 in the morning, that he stayed until about 4:00 in the afternoon, and that during these five hours Geisinger helped Cory repair some of Cory's vehicles.

According to the Kurylas, Geisinger drank exactly two beers during the five hours he spent at their apartment, and Geisinger never gave any indication that he was intoxicated.

Obviously, Geisinger could not simultaneously have been at his own residence, talking to Brown and White, while also being at the Kurylas' residence, helping to repair Cory Kuryla's vehicles. Thus, the testimony given by Brown and White was totally inconsistent with the testimony given by Cory and Sara Kuryla — not on the question of how many beers Geisinger drank in these witnesses' presence (two), but on the issue of where, and with whom, Geisinger spent the afternoon, and also on the issue of whether Geisinger was already intoxicated before these witnesses had contact with him.

Nevertheless, wherever Geisinger may have spent those five hours, it was undisputed that Geisinger arrived at the Hideout Lounge at around 4:00 in the afternoon, where he drank another two beers and ate some food. Geisinger left the Hideout Lounge shortly after 5:00 p.m. and started driving home on Chena Hot Springs Road. The collision occurred about fifteen minutes later.

These facts were undisputed because Geisinger's presence and activities at the Hideout Lounge were captured on the bar's interior surveillance video.

One of the people sitting at the same table as Geisinger, Don Bradley, testified that even though he did not have much interaction with Geisinger, he did not think that Geisinger was drunk.

Another person sitting at that table, Kisha Zangger, testified that even though she, too, did not have much interaction with Geisinger, she only saw him drink one beer, and she did not think at the time that he was intoxicated. However, after reviewing the surveillance video, Zangger testified that she now suspected that Geisinger might have been intoxicated because, "at one point, it seemed like he almost fell asleep."

Two people who came into close contact with Geisinger about a half hour later, shortly after the collision occurred, testified that there was no odor of alcohol about him.

Finally, another of Geisinger's friends, Jennifer Davis, testified that Geisinger called her after the collision, at around 10:00 p.m., while he was hiding from the state troopers. In this conversation, Geisinger told Davis that he had had "a few beers", but that he wasn't drunk. However, Davis noted that Geisinger was not speaking in a normal tone, that his speech was rather slow, and that he was "obviously freaked out".

When Davis was asked if Geisinger sounded drunk, Davis testified that she knew how Geisinger talked when he was drunk, and that, in their phone conversation, Geisinger sounded like he had been drinking. "But," Davis noted, "[Geisinger] was missing some teeth [from the accident]."

The most significant aspect of all this testimony is that *no witness*, either for the government or the defense, testified that they saw Geisinger drinking a quantity of alcoholic beverages that would make a person intoxicated.

Bryce Brown and Cale White, who claimed to have been with Geisinger at his trailer that afternoon, said that Geisinger drank only two beers in their presence over the course of two to three hours. Cory and Sara Kuryla, who claimed that Geisinger spent the entire afternoon at their apartment, said that Geisinger drank only two beers in their presence over the course of almost five hours.

In other words, regardless of which pair of witnesses the jury believed, these pairs of witnesses agreed that Geisinger only drank two beers in their presence. And the video of Geisinger's visit to the Hideout Lounge from 4:00 p.m. to 5:00 p.m. showed that he drank only two more beers — making a total of four, regardless of whether the jury believed Brown and White or, instead, Cory and Sara Kuryla.

Where the testimony crucially diverged was on the issue of how intoxicated (or how sober) Geisinger was *before* he came into contact with these witnesses. Brown and White testified that Geisinger was obviously intoxicated when they first arrived at his trailer around noon. Cory and Sara Kuryla, on the other hand, testified that Geisinger was clearly sober when he arrived at their apartment at 11:00 a.m., and that he remained that way throughout the afternoon.

*(b) The expert testimony presented at the post-conviction relief evidentiary hearing relating to Geisinger's likely blood alcohol level*

To support the claim that Geisinger's trial attorney was incompetent for failing to present expert testimony regarding Geisinger's blood alcohol level at the time of the collision, Geisinger's post-conviction relief attorneys presented the testimony of retired police officer Donald Mann. Mann had received advanced training on how to use alcohol absorption and dissipation rates to calculate a person's likely blood alcohol level,

based on the person's consumption of a particular quantity of alcoholic beverages over a given period of time.

At the post-conviction relief evidentiary hearing, Mann testified that he had reviewed the transcript of Geisinger's criminal trial, as well as the surveillance video from the Hideout Lounge. Based on his review of the trial evidence, Mann asserted that Geisinger had consumed no more than six beers over the course of the five or six hours before the collision.

(Mann's count of six beers was mistakenly high: it appears that Mann erroneously added together the two beers that Bryce Brown and Cale White described and the two beers that Cory and Sara Kuryla described. As we explained in the preceding section, these two pairs of witnesses offered competing narratives of how and where Geisinger spent that afternoon. Either Geisinger drank two beers in Brown and White's presence when they visited him at his trailer that afternoon, or Geisinger drank two beers in the Kurylas' presence when he spent the afternoon at the Kurylas' apartment — but not both. Thus, even including the two beers that Geisinger drank at the Hideout Lounge, the trial evidence showed that Geisinger drank no more than *four* beers in anyone's presence over the course of the relevant five and a half hours.)

In any event, Mann testified that, given the normal rates of alcohol absorption and dissipation in a male of Geisinger's size, any alcohol in the beers that Geisinger drank *before* he arrived at the Hideout Lounge would have been eliminated from Geisinger's system by the time of the collision. The only alcohol in Geisinger's system would have been the alcohol in the two beers that Geisinger drank at the Hideout Lounge. And according to Mann's calculation, Geisinger's blood alcohol level from these two beers might have been .014 percent or lower, and could not have been greater than .032 percent.

Because Mann's calculation of Geisinger's blood alcohol level was apparently at odds with any assertion that Geisinger was under the influence of alcohol at the time of the collision, Geisinger's post-conviction relief attorneys asserted that Geisinger's trial attorney, Spiers, was incompetent for failing to seek out an expert witness like Mann and present this expert testimony.

*(c)  The explanatory testimony offered by Geisinger's trial attorney, Spiers*

When Spiers was asked why he failed to present expert testimony to show that Geisinger's blood alcohol level at the time of the collision was likely quite low, Spiers testified that he made a conscious tactical decision to "stay away from that [issue]".

Spiers explained that his decision was prompted by his consultation with an accident reconstruction expert — an expert who Spiers ultimately chose not to call at Geisinger's trial, because the expert's conclusions were so harmful to Geisinger's defense.

The accident reconstruction expert told Spiers that, most likely, Geisinger had deliberately rammed his truck into the back of the parked car. Thus, Spiers viewed the evidence of Geisinger's potential intoxication as *favorable* evidence for the defense — since it offered some explanation for Geisinger's behavior short of an intent to kill or a deliberate indifference to the value of human life. As Spiers explained:

> I didn't want to attack the idea or the notion that [Geisinger] was under the influence ... . He's seen to drive pretty much like a maniac, and then run into the back end of a [parked] car ... at 55 miles an hour to 60 miles an hour, without doing anything to avoid it.  ...  So let's say that

Mr. Geisinger was not intoxicated. What does that mean? And what does it mean in terms of sentencing? ...

This is where I take issue with the idea of attacking the DUI [charge]. It's somewhat of a benefit to Mr. Geisinger for [the judge and jury] to believe that he was under the influence of alcohol — because, if he wasn't, my God, where does that leave you?

. . .

I was told by my own expert to be very, very careful about how I approached that subject.

Spiers acknowledged that he had called several witnesses to testify that Geisinger had not been drinking that much, and that he did not seem to be intoxicated. Spiers further acknowledged that, at the end of the trial, he argued that Geisinger could not have been impaired for purposes of the DUI statute because he had drunk only a few beers over the course of five or six hours.

But when Spiers was asked whether it would have been better to support that argument with expert testimony, Spiers replied that he "still would not call an expert" — that he "didn't want to call an expert then, [and] wouldn't call an expert now." Spiers explained that he was convinced that Geisinger was inevitably going to be convicted of some level of criminal homicide and assault — and that, given the inevitability of conviction, it was especially important that the sentencing judge, at least, believed that Geisinger had been intoxicated.

Spiers therefore tried to walk a fine line — arguing to the jury that Geisinger was not impaired for purposes of the DUI statute while, at the same time, refraining from offering so much evidence of sobriety that the sentencing judge would become convinced that intoxication had nothing to do with the collision.

*(d)  The testimony offered by Geisinger's attorney expert witness*

At the evidentiary hearing, Geisinger's post-conviction relief attorneys called another expert witness, attorney Karla Taylor-Welch.  In her testimony, Taylor-Welch echoed Spiers's assessment that, because of the uncontradicted evidence of Geisinger's dangerous driving, it was inevitable that the jury would find Geisinger guilty of criminal homicide and assault — although Taylor-Welch thought there was a realistic possibility that Geisinger might be found guilty of lesser degrees of these offenses.

Taylor-Welch declared that she viewed the DUI charge — a misdemeanor offense — as "almost a secondary issue" in Geisinger's case.  According to Taylor-Welch, the manslaughter charge was the "big issue" related to Geisinger's intoxication — because "when you have somebody [who] the State can prove is intoxicated, it makes their [manslaughter] case a whole lot stronger".  Based on this view of the case, Taylor-Welch believed that if Geisinger's trial attorney had been "able to negate intoxication", this would have been crucially important — not because it would defeat the DUI charge, but rather because it would "at least open[] the door for the argument that [Geisinger's offense] was something less than manslaughter" — *i.e.*, that it was criminally negligent homicide.

(But as Spiers explained in his testimony, he saw Taylor-Welch's proposed litigation strategy as presenting an especial danger for Geisinger:  the danger that, given the evidence in Geisinger's case, if Spiers presented evidence that totally negated intoxication as an explanation for the collision, the remaining explanations were substantially worse for Geisinger.)

*(e) The superior court's ruling on this issue*

After hearing this testimony, the superior court concluded that Spiers acted incompetently when he chose not to present expert testimony (in the form of blood alcohol analysis) to establish that Geisinger was not intoxicated.

The superior court acknowledged that Spiers had consciously decided not to present the expert testimony because "he wanted the jury to believe that Geisinger was impaired". The court then noted that, "although Mr. Spiers felt that it was important that the jury believe that Geisinger was impaired, he nevertheless argued in closing that Geisinger was not impaired at the time of the collision. He additionally cross-examined witnesses in a way that would tend to establish that Geisinger was not impaired."

On this record, the superior court concluded that "[Spiers's] decision to argue against impairment while simultaneously attempting to convince the jury that Geisinger *was* impaired (by not seeking out an expert) was not a reasonable tactical decision." (Emphasis in the original) In other words, the superior court ruled that Spiers acted incompetently when he failed to present expert testimony (like Mann's) regarding Geisinger's likely blood alcohol level at the time of the collision.

*(f) Why we reverse the superior court's decision*

We reverse the superior court's decision because, even if Spiers acted unreasonably when he decided not to present expert testimony like Mann's, the record shows that Mann's blood alcohol analysis could not reasonably have had any influence on the jury's decision.

As we have already pointed out, no witness (nor any combination of witnesses) claimed to have observed Geisinger drink a quantity of alcohol that could

reasonably be expected to impair him. The total number of beers observed by all witnesses was only four, and those four beers were consumed over the course of the entire afternoon (five to six hours). No reasonable juror would have concluded that Geisinger was impaired from drinking four beers over the course of five or six hours.

There was, however, other evidence suggesting that Geisinger had consumed enough alcohol to render him impaired. This was Bryce Brown's and Cale White's testimony describing their interaction with Geisinger on the afternoon of the collision, when they went to Geisinger's trailer to inquire about purchasing his motorcycle.

According to Brown and White, Geisinger boasted to them that he had been out all night the evening before, and that he had spent $300 on liquor and beer. The two men further testified that Geisinger was already quite intoxicated when they arrived at his trailer, around noon on the day of the collision. Brown and White described how, when Geisinger decided to show them how his motorcycle performed, Geisinger drove the motorcycle into a ditch — and then, after extricating the motorcycle from the ditch, Geisinger drove his motorcycle down Chena Hot Springs Road at speeds of close to 90 miles an hour, wearing no helmet or eye protection. According to Brown, Geisinger was staggering, he was boisterous, he slurred his words, and he kept repeating himself.

Brown and White testified that they left Geisinger's trailer sometime between 2:30 and 3:00 p.m. It was undisputed that Geisinger arrived at the Hideout Lounge at 4:00 p.m., that he drank two beers there, and that he left the Hideout Lounge shortly after 5:00 p.m. The collision occurred about fifteen minutes later.

When Mann performed his blood alcohol calculation, he ignored Brown and White's testimony about Geisinger's pre-existing state of intoxication when the two men arrived at Geisinger's trailer at noon. Rather, when Mann calculated Geisinger's likely blood alcohol level at the time of the collision, he assumed that there had been

no alcohol in Geisinger's system before Geisinger started drinking the beers that he drank in the presence of the trial witnesses.

Mann's blood alcohol calculation, which was based solely on Geisinger's *observed* consumption of four beers, would have had little relevance if the jury believed Brown and White's testimony that Geisinger had already been drinking heavily, and was obviously quite intoxicated, when the two men visited his trailer earlier in the afternoon on the day of the collision.

On the other hand, Mann's blood alcohol calculation would have been unnecessary if the jury rejected Brown and White's testimony in favor of the version of events offered by the Kurylas: that Geisinger was with the Kurylas at their apartment all afternoon (and not at his trailer, as Brown and White claimed), that Geisinger was sober when he arrived at the Kurylas' apartment, that Geisinger drank only two beers between his arrival at 11:00 a.m. and his departure at 4:00 p.m., and that Geisinger never gave any indication that he was intoxicated during all that time.

We therefore reverse the superior court's ruling that Spiers was incompetent for failing to present this kind of expert testimony.

*Conclusion*

For the reasons explained in this opinion, we AFFIRM those instances where the superior court rejected Geisinger's claims for post-conviction relief, and we REVERSE those instances where the superior court granted Geisinger's claims for relief. In other words, the superior court should have denied Geisinger's petition for post-conviction relief in its entirety.